## WHETSTONE v. THE BANK AT MONTGOMERY.

1. The decision in the case of Crocheron v. The Bank at Montgomery, 5 Ala. 251, reconsidered and affirmed.
2. A witness who is a director of a bank, cannot be asked whether the other directors of the bank and himself, knew with what intention a rail road company issued certain bills or notes.

Error to the Circuit Court of Montgomery.

Motion by the Bank for judgment against the plaintiff in error, as indorser of a bill of exchange for $1000, and judgment for the Bank.

Upon the trial, as appears by a bill of exceptions, the defendant read to the jury, the second section of the charter of the Montgomery Rail Road Company—a communication from Chas. T. Pollard, its President, dated 28th February, 1838—the report of a committee of the Directors of the Bank, dated 7th March, 1838, upon said communication—a contract between the Bank and the Rail Road Company, made shortly after the report was adopted by the Bank—the remonstrance of certain Bank Commissioners, addressed to the President and Directors of the Bank —the report of a committee of the Directors upon the remonstrance, and certain engraved notes or bills, resembling ordinary bank notes or bills, used for circulation, issued June, 1838, under the seal of the Montgomery Rail Road Co., in sums of three and and twenty dollars respectively, issued by the Rail Road Co. payable twelve months after date, to divers persons respectively, at said bank, signed by N. E. Benson, as Secretary, and Charles T. Pollard as President ; and proved that the notes and bills were engraved at an expense of not less than $500, the blanks being filled up with a pen. These papers were read from a printed pamphlet, by consent, and made part of the bill of exceptions.

It was also proved by Pollard, that the communication, report, contract, &c. related to the same transaction—that the notes, or bills read to the jury, issued by the company, were the "bills of credit," "notes," "bills," "promissory notes," and "paper of the

company," referred to in the said communication, report, and contract—that the notes, bonds, or bills, were issued in no instance, except to pay debts due by the company, and then only to their creditors. That the notes or bills were made payable to the .creditors respectively, who were *bona fide* creditors, for work and labor done and materials furnished.

The defendant proved by the cashier of the Bank, that the notes of the Rail Road Company, were received by the Bank in payment of the debts due the Bank from its debtors, and did not receive any from the company—that these notes were the only consideration for the bill sued upon, and certain other bills, discounted by the Bank at the same time. That the Wetumpka and Coosa Rail Road Company, made several applications to the Bank for a large loan, which the Bank rejected. That the same company, then requested the loan of $20,000 in the notes or bills of the Montgomery Rail Road Co., which the Bank had in its vaults, stating that it would answer them as well as Bank paper ; and that accordingly the loan was made on the security of bills drawn by individuals of the company.

He further proved, that the Bank, before it received the notes of the Montgomery R. Road Co. in payment of debts, was secured against loss, by promissory notes deposited with it by the Rail Road Co. and also by a mortgage upon the road and its fixtures.

The defendant further proved by Silas Ames, that he was a Director of the Bank in the year 1838, and proposed to ask him, whether the Directors of the Bank knew that the paper which was to be issued by the Rail Road Co. under the contract with the Bank, was intended by the Company as current Bank bills, or as a circulation in the community. The plaintiff objected to the question, and the court sustained the objection.

The defendant then proved, that the notes of the company circulated as money in the community, sometimes at par, and sometimes under par in small amounts. It was also in proof, that the plaintiff did not receive the Rail Road notes on deposit, and that at the time of the arrangement between the plaintiff and the Rail Road Co., the latter was greatly embarrassed, but in consequence of the arrangement was enabled to resume the work, and carry it on to its completion.

This being all the testimony, the court charged the jury, that

they must consider all the facts and circumstances before them and ascertain the intention with which the Montgomery Rail R Co. issued the said notes or bills. That the question of intention was a matter peculiarly for their determination—if they were convinced that the Rail Road Co. issued these notes, or bills, to pay their debts, and at the same time to circulate in the community as current bank bills, and if the Bank knew they were so issued, then if they were the consideration of the bill sued on, they must find for the defendants, unless they were satisfied by affirmative proof that the Bank had received the notes, or bills, of the Rail Road Company in a regular business transaction, from a *bona fide* holder, who had received them without knowledge of the intention to circulate them as money. That if the Bank so received them, or from one who had received them from some *bona fide* holder, ignorant of such intention to circulate them as money, they must find for the plaintiff.

The defendant prayed the following instructions: 1. That though the creditors of the Rail Road Company, to whom the Company paid these notes, or bills, did not know they were intended to circulate as money, yet if they were received by the Bank from one who knew they were issued by the Company to circulate as money, and were received by the Bank under the contract to circulate them as money, they must find for the defendant; which the court refused.

2. That the communication of the Rail Road Co. to the Bank —the report of the committee of the Directors of the Bank upon that proposition, the contract between the Bank and the Rail Road Company, if founded upon the said communication and report, together with the report of the committee of the Directors upon the remonstrance of the Bank Commissioners, and the form and appearance of the notes or bills of the Rail Road Co., are sufficient evidence that the Bank knew that the notes and bills of the R. Road Co. were issued to circulate as money, and that no recovery can be had on this bill, if the R. Road Co. notes formed its only consideration; which the court refused to give.

3. That if the communication, report, contract, and other facts and circumstances set out in the preceding prayer, were sufficient to put the plaintiff on inquiry, to ascertain the intent with which the Rail Road Co. issued these notes, or bills, and if the notes or bills were issued to pay debts, and circulate as money, and form-

ed the consideration of the bill sued on, they must find for the defendant; which the court refused.

4. That if any thing contained in any of the papers, or documents read to them, or the form or appearance of said notes, or bills, was calculated to cause the plaintiff to suspect, or believe that the notes or bills were issued, as well to circulate as money as to pay debts, then the plaintiff was bound to inquire into the intention with which they were issued, and if the purpose was to circulate them as money, as well as to pay debts, and they formed the consideration of the bill sued on, the plaintiff could not recover.

5. That if the words "promissory notes," used in the first, fourth, and eighth paragraphs of the contract between the Bank and the Rail Road Co., and the word "bills," in the fifth paragraph, mean the same thing, or were intended to apply to the same papers, or issues of said Company, then said contract and the notes, bills and bonds, of the Company, issued pursuant to the contract, were utterly void; and if these bills, or notes, constituted the consideration of the bill sued on, they must find for the defendant; which the court refused.

6. That if the communication of Pollard, the report of the Bank Directors, founded upon it, and the contract between the Bank and the company, form parts of an entire transaction, between the Bank and the Rail Road Company, or that the contract was founded upon the communication and report, and that the terms "promissory notes," and bills, contained in the contract, mean the same thing, as the words "bills of credit," in the said communication, and the words "bills," "notes," "paper of the company," in said report—then the said contract between the Bank and the Company, was void; and if the bill sued upon, was received by said Bank, in consideration of said notes, bills or bonds of said company, issued in pursuance of said contract, to circulate as money, they must find for the defendant; which the court refused.

7. That if the Rail Road Co. stated to said Bank, that the Company proposed to issue their notes, or bills, in payment of debts due by the Company, and to circulate as money—that the Bank agreed to receive the notes in payment of debts due to said Bank, and pay out the same as circulation—that said Company then issued their notes, bills or bonds, bearing the form and simil-

itude of bank notes for circulation—that in pursuance of said contract, the Bank received said bills, bonds or notes, and that said bills, bonds or notes constituted the consideration of the bill sued on, then they must find for the defendant; which instruction the court refused to give.

8. That if the Rail Road Co. issued their notes, bills or bonds, to pay their debts and circulate as money, that said bonds, notes, or bills, bore the similitude of ordinary bank bills, used as circulation—that the said bonds, bills, or notes, were received by the said bank, with the intention to issue them as a circulation amongst the people, and that said bonds, bills or notes, constituted the consideration of the bill sued upon, they must find for the defendant; which the court refused. To all which the defendant excepted.

Judgment being rendered against him, he now assigns for error—

1. The refusal to permit the witness, Ames, to answer the question propounded to him.

2. The charge given to the jury.

3. The refusal to charge as moved for.

Pryor and Hayne, for plaintiff in error. The witness, Ames, should have been required to answer the question, which was not, what the intention of the Rail Road Co. was, in emitting the the paper, but whether the Bank had knowledge of any such intention This was a fact, susceptible of a definite answer. If it be said the contract of the parties was the best evidence of their intent, then the charges moved for should have been given.

The instruction given to the jury was clearly erroneous, and calculated to mislead them, as there was no evidence of the intent with which the notes were emitted. It was also erroneous in the assertion that there could be innocent holders of paper not negotiable, so as to shut out an inquiry into the consideration. [2 Gall. 560.]

Since the act of 1837, the title to a promissory note, can only pass by indorsement—and the fact that they were not indorsed was notice.

The form and appearance of the notes was such, that no one could take them without actual, or constructive notice that they were intended to circulate as money. [12 Pick. 545; 14 Pet. 318; 1 Hill, 11, 17; 2 Ib. 241; 9 Paige, 471; 4 Hill, 442.]

All the instructions prayed for ought to have been given, because it was the duty of the court to construe the written evidence, which was clear and explicit, and in accordance with the opinion of this court, when this question was here before. [5 Ala. 251.]

The payment of the Rail Road notes on the discount of this bill of exchange, was merely the consummation of the contract made by the Bank with the Company, by which it agreed to receive and give circulation to its notes, and having received them with this intent, the notes in the hands of the Bank were void, without reference to the contract, and could not form a valid consideration for any contract. For a case expressly in point, see 2 Hill, 451, 458.

The notes having been illegally issued, were not binding on the Rail Road, and were void in the hands of all who knew of the illegal intent, and of this the form of the bill was sufficient to show they were intended to circulate as money, and the Company was not estopped from making this defence. [8 G. & J. 248.]

It is a general principle, applicable to all contracts, that whatever may be fairly inferred from its terms, is in judgment of law contained in it. [14 Wend. 114; 5 Hill, 147; 10 Bing. 107; 7 Wend. 34; 7 Port. 497; 2 Ala. Rep. 425; Ib. 451; 1 Ib. 160, 436.]

They also cited 9 Porter, 39, 67; 1 Ala. 607, 622; 4 Peters, 410.

ELMORE and BELSER, contra. There is no variance in the testimony now, and when this case was here before, and the charge of the court is in direct conformity with the opinion of this court. [5 Ala. 251.]

The Bank having under its contract received these notes in payment of debts, could have recovered them from the R. Road Co., as their contract with the R. Road Co. was to receive such notes only as the Company could lawfully issue, and having exchanged this paper, for that of the defendant, may recover from him. [9 Peters, 378.]

But if the contract between the Bank and the Rail Road Co. was illicit, it is no defence to the defendant. [3 Rand. 136; 8 Wheaton, 349; 2 Ala. 486; 9 Mass. 423; 16 Id. 94; 10 Peters, 344.]

Whetstone v. The Bank at Montgomery.

The true test, whether a demand connected with an illegal transaction is capable of being enforced at law, is, whether the plaintiff requires any aid from the illegal transaction to establish his case. [7 Taunton, 426; 2 Marsh. 542; 1 Caine's, 104; 6 Ohio, 21; 11 S. & R. 164; 15 Eng. C, L. 559; 3 Vesey, 612; 1 H. & M. 577; 3 Dess. 135.]

ORMOND, J.—In the Bank of Montgomery v. Crocheron, 5 Ala. 251, we considered the principal questions presented by the record in this case. There, as in this case, the controversy grew out of a contract entered into between the Bank at Montgomery and the Wetumpka and West Point Rail Road Company, by which the former agreed to receive in payment of debts, and put into circulation, such bonds, or notes, as the Rail Road Company might lawfully issue. The Bank accordingly received some of the paper emitted by the Rail Road, and again loaned it out in the purchase of bills of exchange, upon one of which this suit is brought, and the payment resisted, upon the ground, that the contract between the Bank and the Rail Road was illegal.

In the case referred to, this court held, that the contract was not illegal upon its face, as it only stipulated, that the Bank should receive such bills, or notes, as the Rail Road Company might lawfully issue under its charter. But if this contract was a mere contrivance to aid the Rail Road Company in evading the prohibition contained in the proviso to the second section of the charter, forbidding it to " emit any notes or bills for circulation," it would be unlawful, and would vitiate a contract made by the Bank, of which the paper of the Rail Road constituted the consideration.

It was then the *intention* with which this contract, between the Rail Road and the Bank, was entered into, by which its legality was to be ascertained, and this was a question of fact, to be determined by the jury, taking into consideration all the facts of the case. It was because the court undertook to pass upon this intent, as matter of law, apparent upon the contract, that the case referred to was reversed in this court. Its aspect is not materially changed in this case. An analysis of the numerous charges moved for, developes the same effort, to withdraw the consideration of the *intent* from the jury, and by grouping

together the attending circumstances, to get the opinion of the court as matter of law.

Thus the communication of the President of the Rail Road to the Bank, proposing to enter into the contract—the report of the directory of the Bank upon the proposition—the report of the directory of the Bank in answer to the remonstrance of the examining committee appointed by the executive, and the appearance of the paper of the Rail Road, are all presented in various forms, and the court asked to instruct the jury, either that if these facts existed, they must find for the defendant—or that they were sufficient to put the Bank upon inquiry, as to the true character of the paper of the rail road—or affected the bank with notice of its true character, in either of which events it could not recover, if the rail road paper was in fact illegally issued.

A very slight examination will show, that none of these facts here relied on, took the case out of the rule laid down in his court, in the case already referred to—that it was a question of fact, as to the intention of the contracting parties. The proposition of the rail road company, and the answer of the Bank acceding to it, were consummated by the contract, which was afterwards made, and in which they are all merged. How far they might be looked to, to explain an ambiguity in the contract, is not a question here. It is not contended that the contract is ambiguous, but it is insisted in the charges moved for, that they demonstrate its true meaning. Not that they are facts, from which the jury might ascertain the inducement to the contract, and infer the intention of the parties to it, but that the existence of these facts, in law, ascertains the intent.

It is doubtless the province and the duty of the court, to expound all written instruments of evidence when called on to do so, and to determine the intention of the parties, from the language employed by them, and that this court has done, in regard to this contract, in the case so frequently referrred to. The accompanying facts here referred to, preceding the contract, might be very persuasive with a jury, as to the true intent of the parties in entering into it; but as they are not a part of the contract, and do not necessarily indicate what the intention was, it was not the province of the court to pronounce upon their effect as matter of law. They were peculiarly questions of fact, for the consideration of the jury.

The correspondence between the directors of the Bank, and the examining committee appointed by the executive, took place subsequent to the making of the contract, and if entitled to any weight at all, can only be considered as admissions on the part of the Bank. It is true that the directory do contend, that the rail road company had the right to emit its obligations for the purpose of circulation, if issued by it in payment of its debts, but it by no means follows from this argument of the directory, that when the contract was made, the bank not only intended to affirm the existence of this power, but also intended to aid the rail road company in carrying it into effect. However strong the inference may be, from this admission, that what the Bank supposed the rail road company might lawfully do, it intended by its contract to aid it in doing, it is not such a necessary consequence as to be matter of law, which the court can pronounce. It is not an admission of the intent, with which the contract was made, but is what it purports to be, a defence of the contract after it was made.

As to the appearance of the paper issued by the rail road company, resembling bank notes, it would doubtless be a strong argument of the intention of the rail road company to make their paper circulate as money, yet unless the bank participated in this unlawful design, it would not be affected by the act of the rail road. Nor, as was held by this court, would the appearance of the bill affect any one, who might receive it, with notice of the unlawful intention, or put them upon inquiry as to the purpose, or design of the emission,

These remarks apply to all the charges moved for, except the first, which, under different aspects, and modifications of the facts, present substantially the same question·

We come now to consider the effect of the charge given by the court, and the first charge refused.

It is clearly established, that no court will lend its aid to one, who founds his action upon an illegal or immoral act. If the contract sought to be enforced is *malum in se*, or forbidden by statute, no court will aid in enforcing it. As, therefore, the emission of paper by the rail road, to circulate as money, was contrary to the charter, any one aiding in the unlawful design, and being thus *particeps criminis*, could not recover of the rail road company. But although the legislature may have forbidden the doing a

particular act, a party not privy to it, or involved in the guilt of the transaction, may recover of the guilty actor, unless the legislature, from considerations of public policy, has declared the act itself void, as in the case of usury, and gaming. In these cases the security itself is contaminated, by the guilt of the transaction, and is void in the hands of an innocent holder for value.

In this case, as the legislature has not thought proper to declare the obligations of the rail road void, though illegally issued, they will not be so in the hands of an innocent holder. To hold otherwise, would be to enable the rail road company to profit by its own violation of the law, and to make the penalty fall upon the innocent. [Faikney v. Reynous, 4 Burr. 2069 ; Lightfoot v. Tenant, 1 Bos. & P. 552 ; Seidenbender v. Charles, 4 S. & R. 159 ; Bayley v. Taber. 5 Mass. 286 ; Biddis v. James, 6 Binn. 321.]

The more difficult question, arising out of the charge of the court, given to the jury, and the first charge refused, remains to be considered. It may be conceded, for the purposes of this case, that if the bank co-operated with the rail road company in an unlawful emission of the paper of the latter, with the intent to aid in its circulation as money, the paper so issued would be void in its hands, no matter how it was received. But this question is not presented upon the record. From the manner in which the charge is given to the jury, they were not instructed to inquire whether the bank participated in the unlawful act of emitting this paper as a circulating medium, but it is the "*knowledge*" of the bank of such unlawful emission, which they were instructed would prevent a recovery, unless the paper of the rail road given in exchange for the bill in suit was received in a regular business transaction, from a *bona fide holder*. In this we think there was no error. The knowledge of the bank, of the illegal character of the emission; is entirely consistent with the entire absence of any co-operation on the part of the bank, with the rail road in the violation of the law. We have already seen that a *bona fide holder* could maintain a suit against the rail road on the paper, and this right he could transfer to any one, not implicated in the guilt of the original transaction.

If the bank, instead of negotiating this paper, by exchanging it for the bill in suit, had brought suit against the rail road, upon what grounds could a recovery have been resisted ? If the bank,

in order to recover, had been compelled to rely upon an illegal contract, the case would have been very different. The contract by which it acquired the paper, was perfectly legal, having received it in payment of debts, and the knowledge which it had. at the time, (if such was the fact,) that the paper had been illegally emitted, could not avail the rail road company. This point was thus ruled in Farmer v. Russell, 1 B. & P. 297. It was there held, that money paid to one for the use of another, upon an illegal contract, could be recovered by the person for whose use it was paid, upon the ground that his action was not founded upon the illegal contract. See also, Tenant v. Elliott, Ib. 3, and Faikney v. Reynous, Burr. 2069. In all these cases, there was a full knowledge of the illegal act, but as the plaintiff did not deduce his title through the illegal act, he was permitted to recover.

The case of Smith v. Strong, 2 Hill, 241, and The Bank of the United States v. Davis, Ib. 451, have been strenuously urged upon us, as conclusive of this case. The first of these cases, was by an indorsee, against the indorser, of a bill of exchange issued by a bank, contrary to a law of the State of New York. The part of the case supposed to be analagous to this, is that part of the opinion of the court, which holds, that if the indorsee, when he took the bill, knew of its illegality, he could not recover of the indorser. This question, it will be observed, was between the parties to the illegal contract—they were both privy to, and aiding in the violation of a public law, and it therefore falls directly within the principle of the cases referred to, in the preceding part of this opinion.

In the other case, the Pennsylvania Bank of the United States, had discounted a bill, with the paper of the old U. S. Bank, and the question was, whether these bank notes, thus put into circulation, had been received by the bank, putting them into circulation, in payment of debts, or had been procured by it, from the old bank for the purpose of being again re-issued. In the latter case, as the notes of the old bank could not, after the expiration of its charter, be re-issued, in judgment of law they were of no value, and no recovery could be had on the bill. The court held that the defendant must show this affirmatively, and as the testimony of the cashier left the matter in doubt, there could be no recovery.

Upon this case we remark, that it differs from the one at bar, in this important particular, that the notes of the rail road, though

issued by it illegally, were not necessarily of no value, but would be valid in the hands of a *bona fide* holder. Further, that it shows that the affirmative of the proposition was held by the defendant. The only proof in the record, upon this point of the case, is, that the bank received the rail road paper in payment of debts due to it, and never received any on deposit, or acquired it in any other mode; and as the rail road company might lawfully emit its obligations in payment of debts, *non constat* that it ever received a rail road obligation, which was not lawfully emitted by it. The charge was therefore, upon this point of the case, abstract, and the court would have been justified in refusing it altogether.

To authorize the defendant to succeed in this action, because of the illegality of the consideration in the purchase or discount of this bill of exchange, he should have shown, that the bank, by the contract entered into with the rail road company, intended to aid, and assist the latter in the unlawful emission of its paper—that the paper was, pursuant thereto unlawfully emitted by the rail road company—and lastly, that the paper with which this bill was purchased, constituted a part of such unlawful emission. To maintain the illegality of this contract, these facts must all be proved affirmatively by the defendant, by evidence either positive or circumstantial, to be ascertained by the jury, and not as is assumed in most of the charges asked for, decided as matter of law by the court. We have been thus particular, in the hope, that the law as here laid down, will suffice for the decision of these cases, should any more exist undetermined.

The question put to the witness, Ames, whether the directors of the bank *knew* that the paper which was to be issued by the rail road company, under the contract with the bank, was *intended* by the company as current bank bills, or as a circulation in the community, was correctly refused.

Evidence, to be competent, must consist of facts, of which the witness has personal knowledge. If the question in this case had been, whether the witness, being a director of the bank, did not know what the intention of the rail road company was, in making the contract, it is difficult to conceive how he could have given a legal answer to it, as his answer must necessarily have been either a deduction from facts known to him, from which he inferred the intention of the rail road company, in the act in question, or he must have derived it from the information of the directors

of the rail road. ˙ The first would have been inadmissible, because it would have been reasoning to the jury, instead of stating facts, and the last would be at least mere hearsay, if not also, his own reasoning founded upon such hearsay testimony.

But the question proposed, is more objectionable than this, as he is called on to state what others knew, as well as himself, of the intention of the rail road company.   It is most obvious, that no answer which ingenuity can devise to this question, would have been competent.   The other directors could not themselves have given their own opinions of the intention of another, in doing a particular act.   Still less could another witness state, what opinion was entertained by them.

The intention, or secret purpose of the mind, is usually mani-. fested by the acts, and declarations of the actor, when the act is done, and may be, and most usually is, inferred by the jury, from the nature of the act, in connection with the surrounding circumstances.   It cannot be established by the reasonings, opinions, or inferences of witnesses.   This question has been before considered by us, and the same conclusion attained as in this case.   [Borland v. The P. & M. Bank, 5 Ala. 546 ; Peake v. Stout, Ingoldsby & Co. 8 Ala.]

Let the judgment be affirmed.