# Herring, Farrell & Sherman v. Skaggs.

## *Action for Breach of Warranty.*

1. *Agent; power of, to give warranty.*—A general agent to sell, without express authorization from his principal, may bind him by such express stipulations as are usual and customary in effecting the sale; and though in some cases—as the sale of a slave, &c., where the agent gave a warranty of soundness—the court will declare the extent of the agent's authority in this particular, as matter of law, the extent of the agent's authority to bind his principal by express stipulations, is, in general, a question for the determination of the jury, in view of what is usual and customary with reference to such sales.

2. *Same.*—A general agent for the sale of Herring s Safes, has no authority, merely by virtue of his agency for their sale, to warrant them burglar proof; and whoever relies on such warranty, must show either express authority, or a custom to give such warranty, in making such sales, before the principal will be bound.

3. *Principal; what act of, amounts to ratification of agent's acts* —The receipt by the principal of the price of a safe which the agent sold, and without authority warranted to be burglar proof, will not amount to a ratification of the warranty, unless received or retained by the principal, with knowledge of the warranty.

4. *Evidence; what admissible.*—Where the agent's authority to warrant a safe as burglar proof, and the making of such warranty, are controverted in a suit against the principal, the latter may show by the agent that he had no express authority to make the warranty; and where the agent, pending the negotiations for the sale, exhibited to the purchaser a descriptive pamphlet, with which the agent was furnished, showing what classes of safes were and what were not represented as burglar proof, the pamphlet is competent evidence in behalf of the principal on the issue of warranty *vel non.*

5. *Charge; what exception to, unavailing.*—A mere general exception to the entire charge of the court, consisting of separable and distinct propositions of law, will not avail the party excepting, unless the entire charge is erroneous.

6. *Evidence; what inadmissible.*—Witnesses, particularly parties, should not, as a rule, be allowed to testify to secret uncommunicated motives of their own conduct, *thus:* in an action against a safe manufacturer (by a purchaser through the agent who warranted it burglar proof) seeking to recover as part of the damages, a sum of money lost by burglars breaking open the safe,— the purchaser can not be permitted to state that, "had he (I) known the real thickness of the safe, I would not have risked my money in it as I did;" though he may testify that he did not know the real thickness until after the safe was broken, and that he confided in the agent's representations; and it is for the jury to draw the inference, whether the purchaser would have risked his money in the safe had he known its real thickness.

7. *Damages; measure of.*—In the absence of fraud or bad faith, the proper measure of damages, in a suit by the purchaser of a safe against the maker,

VOL. LXII.

who warranted it "burglar proof," is the difference between the value of the safe as it was, and what it would have been worth, if it had been as represented; and not the damages sustained in the loss of valuables taken out of the safe by the burglars who effected an entrance into it.

8. *Same.*—To constitute a fraud in such a case, which will authorize recovery for the value of articles lost in the safe, there must be something more than the mere assertion that the safe was burglar proof; there must have been an assertion as a fact, of that which the seller knew to be false; or a reckless affirmation that the safe was burglar proof, when the seller did not know whether the assertion was true or false; or a knowledge on the part of the seller that the safe was not burglar proof, and a failure to communicate that knowledge, when the seller knew the purchaser was contracting for the safe as burglar proof, and the purchaser, trusting to these representations, must have been deceived by them.

9. *Same ; when recoverable.*—When, in such a case, the sale was made by an agent, and the suit is against the principal, damages resulting from the loss of valuables in the safe, can not be recovered, unless it be shown that he was a guilty participant in the agent's fraud.

APPEAL from Talladega Circuit Court.
Tried before Hon. JOHN HENDERSON.

The appellee, Newton J. Skaggs, brought this action against the appellants, Herring, Farrell & Sherman, to recover damages for the breach of a warranty of a safe, sold by them to him. The safe was purchased from one Stewart, as the agent of appellants. The complaint contains three counts, the first two of which allege that the appellants, falsely and knowingly, represented to him that the safe sold was made of a peculiarly tough kind of iron, and would withstand any attempt by a burglar, armed with approved implements of his trade, to enter it for twenty-four hours, and of two burglars, similarly armed, for the space of twelve hours; and that, upon the faith of these representations, plaintiff purchased and paid for the safe; that he placed money and other valuables in the safe, which were lost by the safe being opened and robbed. The third count avers that the defendants were dealers in iron safes, and did employ an agent, and authorized him to sell such safes, and did hold him forth to the public residing in and about the town of Talladega and elsewhere as their general agent for the sale of iron safes, and such agent being in the exercise and discharge of his duties and employment as such agent, sold the safe to plaintiff; that during the negotiations for the sale of said safe, he represented that the safe was made of a peculiarly tough kind of iron, one-half inch in thickness, that could not be entered by a burglar, armed with approved tools, in twenty-four hours, or by two burglars, similarly armed, in twelve hours; and plaintiff averred that the representations so made by him, as aforesaid, by the agent of defendants, were wholly false, and that said agent then and there knew them to be false, and that they were fraudulently made with intent to deceive

and injure plaintiff, and induce him to make said purchase. Each count of the complaint was separately demurred to, it being assigned among other grounds of demurrer that the damages claimed are too remote. The third count was demurred to, because there is no averment that the alleged agent had authority from defendants to make said alleged false representations, or that the defendants knew he had made them when they received the benefits of the contract made by him. These demurrers were overruled.

The plaintiff Skaggs, as a witness in his own behalf, testified that he purchased the safe from Stewart as the agent of appellants; that he had several interviews concerning the sale with him, and in each of these he represented that the safe was made of an unusually hard, tough kind of iron, three-eighths to one-half inch in thickness, and that it was capable of resisting the efforts of a skilled burglar, armed with approved implements, to enter it for twenty-four hours, and of two burglars, similarly armed, for twelve hours; that he put the safe in his store and deposited in it his money and valuables; that said safe was cut open, on the top, with an axe, or some sharp instrument, and money to the amount of about five thousand dollars and a gold watch taken out; that the iron of the safe was very thin, much less than three-eighths of an inch in thickness (about one-sixteenth of an inch), and that it appeared to have been cut and turned back as a sardine-box is turned when opened. In the course of his examination, Skaggs testified that if he had known the real thickness of the iron of the safe, he would not have risked his money in it as he did. To this testimony the defendants objected, "because it is not legal evidence." The court overruled the objections, and they excepted.

Stewart, the alleged agent, was then examined, and after testifying to the circumstances of the sale, he was asked by the defendants, if he had any authority to warrant the safe sold as burglar proof. The plaintiff objected to this question; the court sustained the objection, and defendant excepted. The defendants then offered to prove by the witness, that he had no authority to represent the safe sold to plaintiff as burglar proof, or as any thing but an improved fire-proof safe. The plaintiff objected to this proof, the court sustained the objection, and defendants excepted. Defendants then offered to prove by said witness, that he had present during the negotiations with plaintiff, a pamphlet published by the defendants, containing an accurate description of the sizes and qualities of the safes made by them, and the difference between burglar-proof and fire-proof safes, and in connection with this testimony offered the pamphlet

in evidence. The plaintiff objected to this evidence, the court sustained the objection, and the defendants excepted.

Several witnesses testified as to the real thickness of the iron of the safe, and its appearance after the robbery. The defendants also introduced the list of taxable property which was returned by Skaggs to the tax assessor, in which no mention is made of any money kept on deposit or hoarded.

This was substantially all the evidence, and the court charged the jury in writing. The charge is very lengthy, and the only exception to it, or any part of it, is in the following words, "to each of which the defendants excepted." The court, at the request of the plaintiff, gave the following written charges: 2. What is meant by preponderance of evidence, is that superior weight of evidence which satisfies the mind of the jury of its truth, even when considered in connection with all adverse evidence. 3. If you believe, from all the evidence, that Skaggs had the money and property he testified that he had in the safe at the time of the robbery, then upon the issue as to whether or not he had such money and property in the safe at that time, you must find in his favor, no matter what returns the said Skaggs may have made of this property to the tax assessor. 4. The mere assertion of defendants' counsel as to any matter connected with the cause, have no more authority than the assertions of plaintiff's counsel touching the same matters. To each of these charges the defendants separately excepted. The various rulings to which exceptions were reserved are now assigned as error.

WALDEN & PARSONS, for appellants.—Where a purchaser has been induced to buy through the fraud of an agent of the vendor, the latter being innocent, the purchaser may maintain an action for deceit against the agent personally; but he can not maintain that, or any action in tort, against the innocent principal.—Benjamin on Sales, 375; 36 Ala. 343; 22 Ala. 629; 7 Ala. 622; 1 East, 106. It was certainly competent for the defendants to show, that no authority had been given to Stewart to warrant the safes. It tended to shed some light on the controverted question of warranty *vel non.* And for the same reason, the pamphlet shown to have been used in the negotiations, should have been admitted. It was erroneous to allow the plaintiff to testify that, if he had known the real thickness of the iron, he would not have risked his money in it as he did. Such testimony of a party should not be received, concerning the secret, uncommunicated motives of his own conduct.—36 Ala. 120; 9 Ala. 875; 14 Ala. 743.

[Herring, Farrell & Sherman v. Skaggs.]

SAMUEL F. RICE, *contra.*—The principle on which the complaint and recovery of the appellee is based, is not only salutary, but essential to the attainment of justice, and supported by the highest and best authorities.

It is this—that when the vendor sells a thing *for a particular purpose,* and defrauds the vendee in respect to *its fitness for that purpose,* he is liable for all the damages directly resulting from the prudent use of the thing for such purpose. *The act* of selling, under the circumstances, and affected with the knowledge the seller had of the inducement and purpose which was influencing the buyer in making the purchase, *was equivalent to an affirmative representation* that the property was suited for that purpose, and rendered the seller *an active participant* in giving effect to *the delusion or belief which caused the injury,* and made the seller guilty of deceit. *Maynard v. Maynard,* 49 Vermont Rep. 297, and cases therein cited.

The defendants having received the benefit of the purchase are not permitted to repudiate the deceit of their agent, authorized to make the sale.—*Atwood v. Wright,* 29 Ala. R. 351 ; Perry on Trusts, old edition, § 211, and cases cited in note 8 thereto.

STONE, J.—In *Skinner v. Gunn,* 9 Por. 305, speaking of the power of an agent to bind his principal, this court said : "The power in this case is to sell and convey the negro in the name of the plaintiff, and the agent must, as an incident of that power, and in the absence of any prohibition, have the right to warrant the soundness of the slave, as that is a usual and ordinary stipulation in such contracts, and must therefore be implied to effectuate the object of the power." The court, in the same case, had said, "An authority to do an act, must include power to do every thing usual and necessary to its accomplishment." This doctrine was re-affirmed in *Gaines v. McKinley,* 1 Ala. 446, and in *Cocke v. Campbell,* 13 Ala. 286. It will be observed that, in these cases, the court states, *as matter of law,* that power given to sell a slave carried with it power to warrant his soundness, in the absence of prohibition. A similar principle is found in the books, in reference to the power of an agent to bind his principal, by warranty of the soundness of a horse he is authorized to sell. It is a " usual and ordinary stipulation in such contracts," say the courts. Perhaps the custom of such warranties is so general, and has prevailed so long, that it has come to be treated as judicial knowledge. Certainly it was not intended to be affirmed, that an agent with general powers of sale, has unlimited power to bind his principal, by

[Herring, Farrell & Sherman v. Skaggs.]

any and every stipulation the various phases of traffic may be made to assume. If so, the words, "in the absence of prohibition," found in the case of *Skinner v. Gunn, supra*, are meaningless and powerless. In the case of *Fisher v. Campbell*, 9 Por. 210, a question arose on the implied power of an agent to bind his principal. That was the case of a non-resident planter, whose overseer in charge made purchases of supplies for the plantation and hands. It was proved that the employer had given the overseer instructions to purchase pork for his slaves from a particular mercantile house at Montgomery, with whom he had made arrangements for that purpose, and had given him no directions to buy any where else, nor had he any authority to purchase from any other person. The plantation was in Lowndes county, and, the roads being bad, the overseer purchased pork in his own county, much nearer to him, and at Montgomery prices. Commenting on a charge requested by plaintiffs, and refused by the court below, this court said, "The last branch of the charge is stated as a corollary from the preceding propositions; 'that any special directions given to McMay [the overseer] by the defendant, as to the place of purchasing, was wholly immaterial as to this purchase, unless from the evidence they were satisfied that plaintiffs were *informed* at the time of such sale of such special directions; and that without this information, the plaintiffs would be entitled to recover, if the proof was fully made out.' We understand the law to be the exact converse of this proposition. When a person deals with one who professes to be the agent of another person, the person contracting with him is bound to know the extent of his authority."—See, also, *McCreary v. Slaughter*, 57 Ala.

We are not prepared to assent to the doctrine, in unlimited sense, that a general agent to sell has, by virtue thereof, the power to bind his principal by every species of warranty a purchaser may exact. In Benjamin on Sales, § 624, is the following language : "Warranties are sometimes given by agents, without express authority to that effect. In such cases the question arises as to the power of an agent, who is authorized to sell, to bind his principal by a warranty. The general rule is, as to all contracts including sales, that the agent is authorized to do whatever is usual to carry out the object of his agency, and it is a question for the jury to determine what is usual. If in the sale of the goods confided to him, it is usual in the market to give a warranty, the agent may give that warranty in order to effect a sale." We fully approve and adopt this language of this very accurate writer. We do not intend, however, to overturn the doctrine

[Herring, Farrell & Sherman v. Skaggs.]

declared in *Skinner v. Gunn* and *Cocke v. Campbell, supra*. As a general rule, the agent has power to do whatever is usual—to enter into such express stipulations as are usual and customary—in effecting such sales. What stipulations are usual and customary in effecting such sales, is not always matter of judicial knowledge. It is declared in the sales of slaves and horses to be within the knowledge of the court that it is usual to give warranties. It can not be affirmed that such custom exists in the sale of all chattels. Generally, and we hold in a sale like the present, "it is a question for the jury to determine what is usual." This, in the absence of express authority in the agent to warrant; for if the agent had such express authority, then his act is the act of his principal. And, in the absence of express authority, the question arises, and it is one for the jury, whether such warranty is customary in the sale of safes. If the jury, on the evidence, find there was such custom, then the principal is bound, "in the absence of prohibition" resting on the agent, and brought to the knowledge of the purchaser, to the same extent as if the principal had himself given the warranty. On the other hand, if there was no such authority given, and no such custom found to exist, then the principal would not be bound. True, if the principal ratified the act of such agent, although the act itself had been unauthorized, this would bind the principal. But the receipt of the purchase-money would have no such effect, unless received or retained with knowledge that the agent had given the warranty.

The sale in the present case was made by an agent. In the absence of proof of express authority to warrant, it was incumbent on the plaintiff to show a custom in the sale of safes, to warrant them as burglar proof. Either the express authority, or the authority implied from such proven custom, would constitute the act of the agent the act of the principal; but the law does not imply the authority from the fact that Stewart, who conducted the sale, was a general agent. The third count of the complaint avers that the defendants "did employ an agent, and authorized him to sell such safes, and did hold him forth to the public residing in and about the town of Talladega, Alabama, and elsewhere, as their general agent for the sale of iron safes." This is the entire averment of authority, and we hold it insufficient. It should have been averred that the agent had authority to. make the warranty. Being averred, proof of express authority, or custom to warrant, would have sustained the averment. The 3d count is insufficient, and the demurrer to it should have been sustained.

Under the principles above declared, it became a material inquiry whether Stewart had express authority to warrant the safe as burglar-proof. He should have been permitted to prove he had not such express authority. True, this would not necessarily exonerate the defendants. It would bear on only one phase of the inquiry; for, if such warranties are usual and customary in the sale of iron safes, then even a prohibition of such authority to the agent would amount to nothing, unless knowledge of such prohibition was carried home to the purchaser before the sale was consummated. So, if the published descriptive pamphlet with which the agent was furnished, tended to disclose what classes of safes were, and what were not represented as burglar-proof, and such pamphlet was exhibited to the purchaser pending the negotiation, then that pamphlet should have been allowed to go to the jury, as shedding some light on the controverted question of warranty *vel non.*

The charge of the court, given in this case, was in writing, covering all the points deemed material by the presiding judge. It is a continuous thing, and not divided into separate charges. Many of its utterances are free from error, because they assert plain and uncontroverted principles of law. This general charge covers six folio pages, and the only exception to it is in the following language : "To each of which the defendants excepted." This must be treated as a general exception to the whole charge, and under our rulings, must be disregarded, unless the whole charge is erroneous. A portion of it, at least, being free from error, the appellant can take nothing by this assignment of errors.—*Jacobson v. The State,* 55 Ala. 151. So, the three charges given at the request of the plaintiff below are each free from error.

Against the objection and exception of defendants, the plaintiff was permitted to testify as follows : "If I had known the real thickness of the iron of the safe, I would not have risked my money in it as I did." This was simply proving a reason or motive, not communicated, for doing the act which resulted in the loss of the money. Plaintiff could have testified 'as a fact that he had no personal knowledge of the thickness of the iron until after the safe was hewn open, and that he confided in the representations of Stewart as to its thickness and hardness. The jury then, if they believed this testimony, would have drawn their own inferences, as to whether the plaintiff would or would not have risked his money in the safe, if he had known the true thickness and temper of the metal. This was eminently a function of the jury. But witnesses, particularly parties, should not, as a rule, be allowed to testify to secret, uncommunicated mo-

tives of their own conduct.— *Clement v. Curreton*, 36 Ala. 120; *Gibson v. Hatchett*, 24 Ala. 201; *Jones v. Hatchett*, 14 Ala. 743; *Goodman v. Walker*, 30 Ala. 482; *Whetstone v. Br. Bank*, 9 Ala. 875.

The demurrers also raise the question of the right to recover for the money and watch alleged to have been taken from the safe. The appellant contends these damages are too remote. The doctrine of this court, affirmed in many cases, is, that "the damages which are recoverable must be the natural and proximate consequence of the act complained of."—1 Brick. Dig. 522, §§ 8, 9, 10; *Burton v. Holley*, 29 Ala. 318; *Ivey v. McQueen*, 17 Ala. 408. It is said that the question of the extent of recovery on a breach of warranty has been much discussed of late, and the tendency of modern decisions is, to extend the right of recovery to all the consequences of the breach, where there is fraud in the representation, or stipulation. And in many cases it has been held, that when a manufactured article is sold for a known specific use, and it is not reasonably fit for the purpose, the right to damages goes beyond the bounds which limit the responsibility for an ordinary breach of warranty, and includes compensation for the mischief resulting from the failure of the article warranted, to answer the special purpose to which it is applied. And this doctrine has been sometimes applied in the sale of articles other than manufactured goods. In the case of *Randall v. Roper*, Ellis B. & E. (Q. B.) 84, seed barley had been sold, and warranted to be "chevalier seed barley." The barley was sown, and proved to be an inferior and less productive variety of barley. The barley received was less valuable by 15£. than the same quantity of chevalier seed barley would have been; but it was proved that the purchaser lost in the yield of his crop, by reason of the difference, the sum of 261£. 7s. 6d. It was held that the loss in the yield was the natural result of the breach of warranty, and the plaintiff had judgment for that sum. So, in *Bowadaile v. Brunton*, 8 Taunton, 535, a chain cable had been sold as a substitute for a rope cable of 16 inches, and warranted to last two years. A link of the chain broke within the two years, by which the chain and the anchor were lost. The recovery was for the value of both the chain and the anchor, Chief Justice Dallas remarking, "the holding of the anchor by the cable is of the essence of their warranty." In the case of *Mullett v. Mason*, 1 Com. Pleas Law Rep. 559, a cattle dealer had sold a cow, and fraudulently represented she was free from infectious disease, when he knew she was not. The purchaser placed the cow with five other cows, who contracted the disease and all died. Held, that the purchaser

was entitled to recover the value of all the cows as damages. The court said, "the defendant is liable for all the direct consequences of the plaintiff treating the cow as if it was free from any infectious disease, and placing it, as he naturally would, with other cattle, and the death of the other cows was a direct consequence of his doing that." Speaking of this case, and of the rule of damages in such cases, Mr. Benjamin, in his work on sales, § 904, says: "The damages recoverable by the buyer for a breach of warranty may be greatly augmented, when they are the consequence of a fraudulent misrepresentation by the vendor." And the following authorities are to the same effect: *Kingsbury v. Taylor*, 29 Me. 505; *Emerson v. Brigham*, 10 Mass. 197; *Stone v. Dermy*, 4 Metc. Mass. 151; *Winz v. Morrison*, 17 Tex. 372. So, in *Passinger v. Thorburn*, 34 N. Y. 634, it was ruled that "where the defendant sold cabbage seed, and warranted the same to produce Bristol cabbages, which warranty was untrue, the damages would be the value of a crop of Bristol cabbages, such as ordinarily would have been produced that year, deducting the expense of raising the crop, and also the value of the crop actually raised therefrom." In delivering the opinion of the court, Davies, Ch. J., said: "The damages [on breach of warranty,] must be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract, that is, must be such as might naturally be expected to follow its violation." Further on he said: "In the present case it can not be doubted that the damages which the plaintiff has sustained, are such as arise naturally from the breach of the defendant's warranty. His engagement was, that the seed he sold was Bristol cabbage seed, and would produce Bristol cabbages. It may, therefore, have been reasonably supposed to have been in the contemplation of the parties that if the seed was not Bristol cabbage seed, and would not consequently produce Bristol cabbages, that damage would necessarily accrue to the plaintiff, and would be a natural consequence of such breach. The jury have so said in this case, and we think they came to a correct conclusion." The case of *Flick v. Wetherbee*, 20 Wis. 390, presented substantially the same question, and was ruled in the same way. Each of these cases arose on warranty, without any imputation of *scienter*, *suggestio falsi*, or *suppressio veri*. Fraud cut no figure in them; but it was ruled that the damages complained of and recovered, must have been within the contemplation of the parties. And it is certainly true that in each of the cases last cited, the injury or damage for which the recovery was had, was the direct, known result of the absence of the quality the com-

modities were warranted to possess.—See, also, *White v. Madison*, 26 N. Y. 117.

Some well-considered cases take a distinction between cases of mere breach of warranty, and cases of fraudulent representation of qualities not possessed, or fraudulent concealment of known unfitness for the service the seller knows the buyer has in view in making the purchase. In *Bluett v. Osborne*, 1 Starkie, 384, a bowsprit was sold, which, at the time, appeared to be sound, but was in fact rotten. Consequential damages were claimed, going beyond the mere value of the bowsprit, if it had been sound. The court, Lord Ellenborough, said: "No fraud is complained of, but the bowsprit turned out to be defective upon cutting it up." And he ruled that the measure of recovery was the value of the bowsprit if it had been sound. In the case of *Maynard v. Maynard*, 49 Vermont, 297, the seller knew of the defect in the animal, and fraudulently concealed it. The action was case for the deceit. Large consequential damages were recovered. The principle of the decision is correctly stated in the head note, as follows: " Plaintiff, in purchasing a bull of defendant, informed him that he wanted the bull to put with his cows, but did not ask him whether or not the bull was suitable for that purpose. The bull, though sound in appearance, was, to the knowledge of the defendant, without the power of propagation. Defendant did not disclose his knowledge of that defect, but otherwise used no means to conceal the defect, or in any way to mislead or deceive plaintiff.    .    .    Held, that plaintiff might show that his cows, on account of not having been gotten with calf, produced less butter than they had been accustomed to produce."

The case of the defective cable above is one of extreme, if not of questionable application of principle. So, in *Brown v. Edgington*, 2 Man. & Gran. 279, the doctrine was carried to extreme results. A wine merchant had ordered a crane rope from a dealer, who represented himself as a manufacturer of ropes, and notified the dealer, who took the dimensions, that the rope was wanted to raise pipes of wine from the cellar, and that it must be adapted to that use. In fact, the dealer procured the rope to be made by another, but this fact exerted no influence in the cause. The rope proving defective, parted in the act of hoisting a pipe of wine, by which the wine was lost. The recovery seems to have been, not only for the defective rope, but for the value also of the pipe of wine. The court held that " where a contract is, expressly or impliedly, to furnish goods of a particular description, a warranty is created that they shall be of that descrip-

tion." Nothing was said, either in the argument of counsel, or in the opinions of the judges, on the question of the loss of the wine being too remote, to justify a recovery therefor. It should, perhaps, be observed that in all these cases, except *Mallett v. Mason*, the injuries resulted directly from the known use for which the articles were procured, without extraneous interference or adventitious circumstances, and purely from inherent defects or inaptness for the service required. They were the natural consequence of the falsity of the warranty. In a note to Sedgwick on Damages, 4th Ed. pp. 334–5, it is said : "By the doctrine of the late decisions, when for the want of a certainly defined, existing and intrinsic quality which an article sold is warranted by the vendor to have, consequential damages naturally ensue as the direct result of its application by the vendee to the purpose for which he intended it, and the vendor knew he intended it, the vendor is liable for such damages."—See, also, *White v. Miller*, 71 N. Y. 118.

In the cases of *Kingsbury v. Taylor, Emerson v. Brigham,* and *Stone v. Denny, supra,* the measure of recovery was stated to be materially affected by the good faith or fraud of the seller. In cases of breach of warranty, untainted by bad faith, the measure of recovery is limited to compensation for the natural and proximate consequence of the failure of the commodity sold to come up to the warranty, uninfluenced by adventitious circumstances, and can only include the consequences which were reasonably within the contemplation of the parties when they made the contract. In the present case, if there was no fraud or bad faith in the sale, the proper measure of damages is the difference between the value of the safe as it was, and what it would have been worth if it had been as represented. This alone is the natural, proximate consequence of the breach ; this alone can reasonably be presumed to have been within the contemplation of the contracting parties. To go beyond this, would be to give to a contract of warranty all the attributes of a contract of insurance. The two contracts are very different in their scope and obligations, and contemplate very different consequences from their breach. The *nisi prius* case of *Sanborn v. Herring,* reported in Amer. Law Reps. N. S. page 457, presented very nearly the same controverted questions, and the same conflict of testimony as are found in this record. The case resulted in a verdict for the defendant, doubtless on a failure of the jury to find fraud or bad faith in the seller. The very similar case of *Walker v. Milner* was tried in London, about the same time, before Lord Ch. J. Cockburn, but we have no access to a report of that case.

[Herring, Farrell & Sherman v. Skaggs.]

In an able note to the American case, reviewing both trials, is the following language : "An undertaking against all possible force and skill of all future burglars, is so much more like a contract of insurance than one of warranty, that we doubt whether such an undertaking would ever be held by the courts to be created by general words of warranty. A warranty has reference generally to the character and qualities of the thing warranted, not to the acts of third persons. But a contract of insurance does provide against perils of robbers as well as perils of the elements. A contract of insurance, however, implies a premium paid for the risk assumed, in proportion to the amount of the risk, and also a fixed term of insurance. All these elements were wanting in the contracts of warranty set up in the cases before us. There is great force, however, in the position that a manufacturer who sells a safe, as a fire-proof or burglar-proof safe, thereby represents that its securities against fire or burglary are as complete as the experience of those engaged in the business can make them. But it also follows that as soon as the warranty is construed as one, not of absolute, but only of comparative security, then the manufacturer is let in to show that the purchaser can only ask as much security as he is willing to pay for.

In the English case, there does not appear to have been any point raised as to the measure of damages. Both court and counsel seem to have assumed that if the plaintiff was entitled to recover, he was entitled to recover the value of his lost property—6,000 l. This point, however, would appear to have been sharply contested in the case in New York, and the plaintiff's counsel did not claim that he was entitled to anything more than the difference between the value of the safe purchased and that of such a safe as the representations entitled him to, unless the jury found a fraudulent warranty by defendants.          .          .          The general rule is, that the parties are deemed to contemplate such damages as the creditor may suffer from the non-performance of the obligation *in respect to the particular thing* which is the object of it, and not such as arise collaterally. The damages may be enhanced, it is true, where the conduct of the party in fault has been fraudulent, where property has been sold for a particular use, and in other cases, but we know of no case where, for a breach of warranty, damages have been held recoverable, so far in excess of the amount involved in the original transaction, as the damages claimed in these actions."

The fraud which would justify a recovery in this case com-

[Herring, Farrell & Sherman v. Skaggs.]

mensurate with the value of the goods lost from the safe, would not be the mere assertion that the safe was burglar proof, or, would resist the assaults of burglars for any specified time. That may have been the expression of an opinion honestly entertained. Integrity of purpose and fraud do not co-exist. Bad faith is necessary to maintain the claim to the larger damages. To make good this feature of the claim, there must have been an assertion as fact of that which the seller knew to be false, or a reckless, false affirmation that the safe was burglar proof, when the seller did not know whether the assertion was true or not, or, a knowledge on the part of the seller that the safe was not burglar proof, and a failure to communicate that knowledge, when he knew the purchaser was contracting for the safe as burglar proof ; and the purchaser must have trusted these representations, and been misled by them. One of these categories must be shown, to entitle the plaintiff to the larger damages claimed.

The sale in this case was made by an agent, and the suit is against his principal. We have above laid down the rules for determining whether the act of the agent in this case is the act of the principal. Even if it should be shown that the agent was authorized to warrant the safe as burglar proof, this would not conclude the principal, unless one of the forms of fraud above described can be carried home to the principal, thus making him a guilty participant in Stewart's fraud, or, unless it be shown that the principal, with a knowledge of the fraud perpetrated by the agent, received and retained the fruits of such fraudulent sale. Anything short of this will leave the liability to account on the agent alone.

The first and second counts of the complaint are sufficient, for they charge on the defendants themselves, knowing an intentional misrepresentation in making the sale, that the safe would resist for twelve or twenty-four hours the most skillful attempts of burglars to enter it. The third count has the further defect that it fails to connect appellants with the alleged fraud of the agent.

Reversed and remanded.