## MARYLAND CASUALTY CO. v. MOORE.*

### No. 3092.

Circuit Court of Appeals, First Circuit.

March 6, 1936.

Edward F. McClennen, of Boston, Mass. (Arthur E. Whittemore and Edward Williamson, both of Boston, Mass., on the brief), for appellant.

Harold S. Davis, of Boston, Mass. (William S. Youngman, Jr., of Boston, Mass., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

MORTON, Circuit Judge.

This is an appeal by the defendant below from a judgment against it in an action at law upon a bond. We shall refer to the parties, plaintiff and defendant, as they appeared in the trial court. The case was heard jury waived, the only evidence submitted being the report of an auditor to whom it had been referred. The essential facts are as follows:

Pelham Hall, Inc., a Massachusetts corporation, acquired land in Brookline, Mass., and proceeded to erect on it a large apartment house having shops and offices on the street floor. Part of the necessary capital was obtained by an issue of bonds secured by a first mortgage on the property. Arrangements for the issue were made between Pelham Hall, Inc., and the American Bond & Mortgage Company, and the bonds were marketed by the latter company. The agreement covering this phase of the matter is in writing and is referred to as the "brokerage agreement." The mortgage securing the bonds was made by Pelham Hall, Inc., to the plaintiff, Moore, as trustee for the bondholders. It was an elaborate tri-partite instrument signed by Pelham Hall, by Moore, and by the American Company.

The brokerage agreement required Pelham Hall to give a bond with surety guaranteeing to the American Company, to Moore as trustee, and to the "legal holders" of the bonds the completion of the proposed building. This bond was duly given, the defendant signing it as surety. It is the bond in suit. No question is now made but what Moore as trustee is entitled to bring action upon it. The bond refers to, and incorporates by reference, both the brokerage agreement and the tri-partite mortgage. The condition of it is, basically, that if the principal (Pelham Hall, Inc.) "shall, well and truly erect or cause to be erected the said building," according to the terms, conditions, and requirements of the agreements referred to, then the obligation shall be void. The bond also contains certain explicit agreements by the surety which will be referred to later.

When the building was approaching completion, the contractor failed and abandoned the work; Pelham Hall, Inc., was unable to take it up and complete it; the defendant was requested to do so and refused; and Moore as mortgagee took possession of the property (as the mortgage gave him an express right to do under such circumstances), and carried the building forward to completion. The cost of doing so was about $306,500. Of this sum, $125,000 came from the proceeds of bonds which had been sold; the remaining $181,500 was loaned to Moore by the American Bond & Mortgage Company. It is this latter sum with interest which he seeks to recover in the present suit.

The defendant's first contention, which in the court below was its principal

contention, is that the building which was bonded was not the building which was built; that after the bond was signed the plans of the building were so radically changed that the surety is released. There is no controversy as to the changes which were made. They consisted, essentially, in enlarging and extending the commercial parts of the building, with a corresponding decrease in the apartments and in the rooms devoted to apartment use. They were confined to the street floor and to the portions of the building adjacent to or used with the shops and offices. The rest of the building was not changed at all; and its size was not changed. The number of apartments was reduced about 5 per cent., and the number of rooms about 10 per cent., and the commercial space was increased accordingly. The auditor found that the changes did not increase the cost of construction. He also found that the changes were substantial, and that the building actually erected could not properly be said to be the same building as that described in the plans and specifications on which the bond was based.

The District Judge said, "Since the changes did not increase the cost of construction, it is difficult to see how the surety has been in any way prejudiced by these modifications. While the modifications are of a substantial nature, I regard them as within the scope of the undertaking which the defendant insured. They did not constitute a new contract, imposing additional burdens upon the surety.

"The defendant was a compensated surety, and as such cannot invoke the ancient doctrine of strictissimi juris. * * * The more modern rule which, according to the great weight of authority, has been applied in cases involving the legal obligations of a compensated surety, is that the departure from the guaranteed contract [in order to release the surety] must be not only material but prejudicial to the surety. * * * The case at bar does not present a departure which substantially affects the character of the risk assumed by the defendant, and for that reason it is my opinion that it cannot be regarded as a valid defense to the plaintiff's action.

"I, therefore, find and rule that the plaintiff is entitled to recover judgment in this action in the sum of 500,000, the penal sum of the bond."

The question presented has been frequently considered in judicial opinions; it is not necessary to repeat the discussions.

As the District Judge said, the great weight of authority supports the view which he took. See Maryland Casualty Co. v. Dunlap, 68 F.(2d) 289 (C.C.A.1); New Amsterdam Casualty Co. v. United States, 67 F.(2d) 488 (C.C.A.3); National Surety Co. v. Lincoln County, 238 F. 705 (C.C.A.9); Atlantic T. & D. Co. v. Laurinburg, 163 F. 690 (C.C.A.4). There are many cases to the same effect in the state courts. In American Surety Co. v. Greek Catholic Union, 284 U.S. 563, 52 S.Ct. 235, 76 L.Ed. 490 (1932), the court assumed the law to be that a change in the obligation guaranteed must, in order to release a compensated surety, be substantial and also prejudicial to the surety; and this appears to have been so decided in Chapman v. Hoage, 56 S.Ct. 333, 80 L.Ed. ——, January 6, 1936. A change so basic as to alter the general character of the undertaking would, of course, release the surety. The District Judge was well warranted in finding that no such changes had been made in this case.

Moreover, the contract, performance of which was guaranteed by the bond, expressly reserved the right to make changes in the building. The defendant contends that this provision did not permit any change in the number of apartments or of rooms. So construed, the provision practically freezes the building into the form shown on the plans at the time when the bond was made, which was clearly the very thing the parties were endeavoring to avoid. We think that the reference to the number of apartments and rooms in this clause of the contract is descriptive rather than limiting, and that the provision gives by contract a right of alteration not greatly different from that implied by law as above stated. It follows that the bond was a valid obligation attaching to the building actually erected.

Passing by certain defenses of purely technical character raising points of practice or of pleading which do not seem to us to be well founded nor to require discussion, the defendant's next contention is that steps, taken by Moore and the American B. & M. Company with reference to the completion of the building after the default by the contractor and the owner, operated to relieve the surety from liability, or from paying anything more than nominal damages.

Moore, as trustee, went into possession and completed the building without foreclosing the mortgage. The expense to him

of doing so was by the terms of the mortgage made an underlying lien preceding the bonds. The equity in the building when completed belonged to Pelham Hall, Inc., subject to a second mortgage which had been given. The auditor finds that the property then had "a fair market value of at least $1,450,000," and that the liens on it secured by the first mortgage, i. e., the bonds, $1,200,000 and the completion expense $181,500, amounted to $1,381,500. In this situation the persons, who largely owned the stock of the American B. & M. Company and controlled that company, acquired all the stock of Pelham Hall, Inc., and a sufficient amount of second mortgage bonds to force a foreclosure of the second mortgage. They used a corporation controlled by them, the American Mortgage Loan Company, to buy the equity on the foreclosure of the second mortgage, paying $50,000 for it. They then organized a new corporation "The Pelham Hall Corporation" to own and operate the building and the title so acquired was transferred to this corporation. At this point Pelham Hall, Inc., and the second mortgagees had been eliminated, and the property was owned by the new corporation subject to the first mortgage.

It is pressed upon us that because of the fact that the same persons or group of persons, referred to by the auditor as "the Moores," owned the stock of the American B. & M. Company, the American Mortgage Loan Company, Pelham Hall, Inc. (at the time when the second mortgage was foreclosed), and Pelham Hall Corporation, the various corporate entities should be disregarded, and it should be held that the equity in the property was in effect owned by the same person who held the mortgage and thereby became merged in the mortgage title or interest held by Moore, trustee; that as owner (on this assumption) of the equity he stood in the shoes of Pelham Hall, Inc., the principal on the bond, and therefore could not recover against the surety. The auditor in an interesting report held in effect that there was what amounted to 'a conspiracy among the Moore interests to complete the building at the expense of the surety for the benefit, not of the bondholders for whom the completion bond was really made, but of the owners of the equity which was acquired by the Moores. He arrived at this result by a complete disregard of the various corporate entities involved.

The question whether these corporate entities should be disregarded was carefully considered with reference to the rights of the bondholders in Hallett v. Moore, 282 Mass. 380, 185 N.E. 474, 91 A. L.R. 572, on alleged facts which appear to be as complete as those before us; and it was held that no sufficient grounds appeared for doing so. While the issue is here raised by a different party and there is, of course, no estoppel by adjudication, it is still the same question on substantially the same facts and it was, we think, correctly decided in the Hallett Case for reasons stated in that opinion. See, too, Commissioner v. Eldridge (C.C.A.) 79 F.(2d) 629, 631. It follows that there was no such merger of interests as the defendant contends and that Moore as trustee is entitled to enforce against the defendant the rights given him in the bond.

The next point rests on certain provisions of the "brokerage agreement." In that agreement it was expressly stated that payments to Pelham Hall, Inc., of the proceeds from the sales of mortgage bonds "shall be made only on satisfactory evidence furnished to the broker that the unpaid balance of the proceeds of the sale of said bonds is sufficient to complete, furnish, furniture, and equip the said proposed building." As has been said, this agreement was by reference made part of the bond, and at the time when the contractor and Pelham Hall, Inc., abandoned the work, there was available from sales of bonds only $125,000, while $306,500 was to complete the building.

The defendant insists that the failure of the American Company and Pelham Hall to observe this provision of the contract between them relieves it from its obligation. Two of the obligees to whom the bond was made, Moore, trustee, and the bondholders, were not parties to the brokerage agreement; as to them it was res inter alios. The provision in question was one which might be waived by the American Company. It is said in the agreement that "parts or the whole of any of the installments of net proceeds of sale of said bonds may be paid to the Owner if the Broker * * * believe it advisable to do so." If the rights of the other obligees were to be conditioned on a strict insistence by the American Company on its rights under this "withholding" provision, that fact should have been so stated in the bond. The mere incorporation of the

brokerage agreement into the bond clearly does not have that effect. The present bond with three several obligees is radically different from those under consideration in the decisions relied on by the defendant.

The final question is whether damages were proved and were correctly assessed. The property in question was sold on foreclosure of the first mortgage in May, 1931. It is agreed that the amount received for it was less than the amount required to pay the bondholders in full, and that the deficit was more than the judgment in this case, including interest. The District Judge said, "If, after satisfying the prior lien of $181,000 or more, there was enough left (from the proceeds of the foreclosure sale) to satisfy the bondholders, I should then find no damages. If there was not enough left, I should find that they were damaged for whatever the deficiency was up to $181,000, plus interest, which the surety company was to pay." It is doubtful whether this assessment is in accord with Massachusetts law. See Province Securities Corp. v. Maryland Casualty Co., 269 Mass. 75, 168 N.E. 252. It is in accord with Trainor Co. v. Aetna Casualty & Surety Co., 290 U.S. 47, 54 S.Ct. 1, 78 L.Ed. 162, where the Massachusetts rule on this point is explicitly disapproved.

It is unnecessary to decide whether the damages were correctly assessed under Massachusetts law, or whether the state or the federal rule should be applied, because under the provisions of the bond and the facts found the assessment made was clearly not too large. In the bond the defendant covenanted that "all sums advanced by the Obligees or any of them to make good any default of the Principal under said contract for the said bonds, and said mortgage or deed of trust, in any act or thing to be done or performed prior to and including the erection and completion of and payment for said building, the surety agrees to repay the persons so paying the same, forthwith as each payment is made, with interest at the rate of seven percent per annum from the time of the respective payments." This is a straight contract for the repayment of money. The plaintiff as trustee made payments amounting to $181,500 which clearly came within its terms. The defendant's contention, viz., that in making them Moore acted, not in his capacity as trustee for the bondholders, but for himself and his associates who were endeavoring to secure the equity in the property, and in legal effect for Pelham Hall,

Inc., which as principal on the bond would have no right to recover against its surety, is, for reasons above suggested, untenable. There are no findings by the District Judge in support of it, and the manner in which he dealt with the various requests for findings and rulings show that he rejected it. The auditor's report did not compel a different conclusion.

The judgment of the District Court is affirmed with interest and costs.