232 So.2d 616

**UNITED BONDING INSURANCE CO.**

v.

**W. S. NEWELL, INC., a Corp.**

**3 Div. 380.**

Supreme Court of Alabama.

Nov. 20, 1969.

Rehearing Denied Feb. 26, 1970.

London, Yancey, Clark & Allen and Thomas R. Elliott, Jr., Birmingham, for appellant.

Ball & Ball and John R. Matthews, Jr., Montgomery, for appellee.

SIMPSON, Justice.

This is a suit wherein W. S. Newell, Inc., as plaintiff, claimed $40,000.00 damages for the breach of a condition of a bond made by United Bonding Insurance Company, as surety, with Hankins & Sigars Trucking Company, as principal.

The case was tried to the Circuit Judge below who made special findings of fact, at the request of the appellant, as provided by Title 7, § 262, Code. The facts of the case, taken from the trial court's opinion, were as follows:

On March 10, 1966, W. S. Newell, Inc. had a subcontract with Newell Roadbuilders, Inc., a general contractor, under the State of Alabama for the construction of a segment of interstate highway I–65 near Bay Minette, Alabama, to manufacture,

haul and install asphalt pavement on that project. On that day the plaintiff subcontracted with Hankins & Sigars to supply all trucks needed to haul the asphalt produced by it from its (the plaintiff's) plant site, some miles from the project, to the interstate project.

On May 5, 1966, Hankins & Sigars furnished performance and payment bond in the amount of $82,660.00 in favor of Newell Roadbuilders, Inc., executed by United Bonding Insurance Company, bearing its corporate seal, and countersigned by Stewart R. Pollock of St. Petersburg, Florida. Attached to the bond was a power of attorney, also bearing United's corporate seal, which authorized Mr. Pollock to execute on behalf of United, the above bond in favor of Newell Roadbuilders, Inc. The power of attorney stated that it was given under the authority of a resolution of United's Board of Directors which authorizes the president to appoint agents "to execute, on behalf of the Company as Surety, bonds and undertakings, recognizances, contracts of indemnity, and other writings obligatory in the nature thereof."

When the bond was delivered W. S. Newell, Inc. discovered that the name of Newell Roadbuilders, Inc. had mistakenly been asserted as obligee, and it requested that this be corrected. On May 24, 1966, Mr. Pollock issued a rider to the bond, bearing United's corporate seal, which changed the name of the obligee to W. S. Newell, Inc.

The trial court noted that an examination of the power of attorney disclosed that two typewriters were used in typing the typed portions of the bond. Mr. Pollock's name and his maximum authority were typed on one machine, while the specific information relative to the bond in suit, i. e., the names of the principal and obligee, and the dollar amount of the bond, were typed on another machine.

The trial court concluded that this difference plus the broad and unlimited authority granted by the corporate resolution convinced the court that blank powers of attorney were furnished to Mr. Pollock, and that he was authorized to issue bonds to whomever he saw fit and to fill in the pertinent information concerning the principal, obligee, and the amount of the bond in blank spaces on the power of attorney.

United contended that the bond was void because (1) the power of attorney limited Mr. Pollock's authority to execute a bond in favor of Newell Roadbuilders, Inc.; and (2) Mr. Pollock was not a licensed agent for counter-signature in Alabama.

Hankins & Sigars commenced work under its subcontract, hauling materials from March 15, 1966 to June 28, 1966, at which time it abandoned its work and refused to haul any additional materials. W. S. Newell, Inc. then contracted with Robinson & Bethea Trucking Company to complete its hauling requirements.

The finding was that during the course of its employment, Hankins & Sigars never complied with its contractual obligation to "at all times maintain sufficient men, materials, supplies and equipment and supervision on said job and prosecute work with such care, diligence and promptness as will not cause delay in the progress of CONTRACTOR'S [plaintiff's] work * * *."

In this connection the evidence was that the plaintiff's asphalt plant, which was located some miles from the interstate project, had an average daily productive capacity of 1,500 tons. However, it could produce no more than Hankins & Sigars' trucks could haul away, and if Hankins & Sigars did not maintain sufficient trucks for the orderly flow of production, then the plaintiff of necessity would have to retard its production to keep pace with the availability of trucks. As the length of the haul from the plant to the construction site increased, the number of rounds which a given truck could make per day decreased, thus creating the necessity for additional trucks to keep up with plant production. The finding of

the court was that even during the initial stages of the job, when the haul was the shortest, Hankins & Sigars was deficient in trucks needed to adequately handle the productive capacity of the plant. As noted by the trial court, "Indeed, the evidence was without serious dispute that, despite repeated complaints and demands by the plaintiff, Hankins & Sigars was short by three to five trucks per day of the number of trucks needed to keep up the steady flow of production". In addition the trucks on hand were plagued with breakdowns and remained idle for long periods of time due to lack of supervision by Hankins & Sigars. Also, because they were not paid their agreed compensation by Hankins & Sigars, the truck drivers struck for two full days in early June.

It is not disputed that the plaintiff was delayed by lack of trucks and by truck breakdowns. The only question involved here, and below, was the extent and effect of those delays.

Defenses interposed by appellant below were the following:

(1) Invalidity of bond sued on.—The appellant contended that the bond sued upon was void because (a) the power of attorney limited Mr. Pollock's authority to execute the bond in favor of Newell Roadbuilders, Inc.; and (b) Mr. Pollock was not a licensed agent for counter-signature in Alabama. The trial court concluded that the bond was valid.

(2) Contract modifications discharged United of any obligation under the bond.— It was next contended that certain modifications of the contract between plaintiff and Hankins & Sigars had the effect of discharging United from any obligation under its bond. The contract modifications relied upon were (a) that the hauling requirements for asphalt or plant mix were reduced, as a result of a state change in asphalt thickness, from the stated contract quantity of 135,000 tons; and (b) that the plaintiff and Hankins & Sigars agreed to a change in the contract whereby Hankins & Sigars would be paid for work performed each two weeks rather than once a month; and (c) that the plaintiff agreed to reduce the retainage on earnings from seven and one-half percent as stipulated by the contract to three and one-half percent.

The trial court found in favor of the plaintiff and fixed damages at $31,481.67. The defendant appealed.

The contentions of the appellant on this appeal are as follows:

(1) That the trial court erred in its conclusions with respect to the validity of the bond in suit insofar as the same applies to the appellee. It is the position of the appellant that the bond in evidence was not sufficient to validly bind the appellant to W. S. Newell, Inc, as obligee for the following reason: that the power of attorney which was attached to the original bond which was erroneously written to Newell Roadbuilders, Inc. as the obligee, was insufficient authority for the rider furnished by the agent, which changed the name of the obligee on the bond to W. S. Newell, Inc.

It is the contention of the appellant that no power of attorney was ever produced authorizing Pollock to write a bond in favor of W. S. Newell, Inc.

(2) The invalidity of the bond is asserted by the appellant for that it was not properly countersigned by a licensed, resident agent, as appellant contends is required by Title 51, § 823, Code of Alabama.

(3) It is next contended by the appellant that the trial court erred in the manner in which it calculated damages for delay and for failure to supervise under the bondage of the contract. It is the contention of the appellant that the trial court adopted an artificial formula in fixing the damages suffered by the appellant and for this reason the judgment should be reversed.

(4) It is finally contended by the appellant that it should be relieved of any obligation under the bond by virtue of alterations made in the contract between W. S.

Newell and Hankins & Sigars. Specifically it is the contention of the appellant that the alteration of the bonded subcontract calling for the reduction of the retainage from seven and one-half percent to three and one-half percent discharged the surety from any obligation that it had under the bond. It is next contended that premature payments made by W. S. Newell, Inc. to Hankins & Sigars, that is paying Hankins & Sigars every two weeks as opposed to once a month as provided for in the contract, released the surety from liability under the bond.

It is to these contentions that we address ourselves.

Is there sufficient evidence to support the conclusion of the trial court that the appellant gave Stewart R. Pollock the authority to execute the bond and its corrective rider in favor of the appellee? The appellant's argument that Pollock did not have the required authority is based upon the following:

(1) Because the power of attorney attached to the bond specifically limited Pollock's authority issuing a bond to Newell Roadbuilders, Inc.

(2) That the power specifically provides that a copy must be attached to any instrument executed by Pollock;

(3) And that the powers provide that it can be used only once.

To the above the trial court responded:

"The court is not impressed with United's first argument. In Hill [Co.] v. Taylor, 232 Ala. 471, 168 So. 693, the Supreme Court stated:

" 'The presence of the corporate seal establishes prima facie that the instrument to which it is affixed is the act of the corporation, and dispenses with the necessity of any proof on the part of the person claiming under it that it was executed by the proper officers of the corporation, or that they had authority to so execute it, or that all proceedings to legalize its execution were had unless the corporation shall have rebutted the presumption arising from the presence of the seal. Graham v. Partee, 139 Ala. 310, 35 So. 1016, 101 Am.St.Rep. 32; Allen v. Alston, Ex'r., 147 Ala. 609, 41 So. 159; Amerson v. Coronoa [Corona] Coal & Iron Co., 194 Ala. 175, 69 So. 601; Code, § 6862.' "

■ We think the law is correctly stated in Hill Co. v. Taylor, supra, relied upon by the trial court. In this case no evidence was offered by the appellant which tended to deny that Pollock had authority to write the bond in question. A cursory reading of the evidence on this point supports the conclusion of the trial court that Pollock was furnished blank powers of attorney which limited his authority to $250,000.00. The power of attorney furnished in this case was dated January 5, 1966.

It is clear from an examination of the documents introduced in this case that the appellant intended to guarantee performance by Hankins & Sigars of its contract with the appellee, but that Newell Roadbuilders, Inc. was named as obligee by mistake. The power of attorney is attached to a bond which identified the contract bonded by the same date, the same amount, and the same project as the contract between the appellee and Hankins & Sigars. That contract was specifically incorporated into the bond by reference. There was no contract between Hankins & Sigars and Newell Roadbuilders, Inc.

We think the evidence clearly supports the trial court's conclusion that there was a mistake in the name of the obligee on the power of attorney and the bond. When the mistake was called to Pollack's attention, he immediately issued the corrective rider under the appellant's corporate seal.

■ The presence of the corporate seal established prima facie that the bond was the act of the corporation. No evidence was adduced to rebut this presumption. It follows, therefore, that the trial court cannot be reversed in its finding on this issue.

The next contention of the appellant raises the following issue: Does the fact that the bond was not countersigned by a resident agent of the State of Alabama make the bond void? In support of this contention the appellant argues that the provisions of Title 51, § 823, require a holding that the bond sued upon is void in that it was not signed by a resident agent of the State of Alabama. The statute invoked provides:

"To assure the validity and construction of contracts according to the laws of this state, and to facilitate the collection of privilege taxes and fees for agents, all fire, surety and casualty insurance companies doing business in this state shall execute all contracts upon property or risks in this state through resident agents, duly licensed, who shall execute or countersign all such contracts. No special agent shall execute or countersign contracts."

The appellant invokes this statute to invalidate the bond sued upon. In so doing it admits that it is contravening the provisions of that statute. In answer to this contention the trial court stated:

"It would be a strange and unjust result if a paid surety could escape its obligations under a bond because it violated a law designed to protect Alabama residents and to collect revenue. Indeed, it would open the doors to all sorts of fraud and trickery on unwary policyholders by nonresident companies whose ethics are below that of the insurance industry generally."

The statute relied upon by the appellant does not have the effect contended for by it. The purpose of Title 51, § 823 was for the protection of citizens of the State of Alabama. Like other statutes requiring certain acts of foreign corporations doing business in the State of Alabama, it was intended for the protection of the citizens of the state, and to facilitate the collection of privilege taxes that the statute required that all foreign companies writing

policies of insurance in this state would do so through resident agents. Nothing in such statute was intended to absolve non-complying foreign corporations from liability on bonds or policies of insurance written in the state in derogation of that statute. As pointed out in Bell for Use of Fidelity Ins. Co. v. Freeman, 39 Ala.App. 519, 104 So.2d 771, the Court of Appeals in reference to Brooklyn Life Insurance Co. v. Bledsoe, 52 Ala. 538, said:

"The court pointed out that statutes requiring foreign companies before doing business in a State to comply with the requirements of its laws are intended for the protection of its citizens and not to absolve the company from liability on its contract made in said State * * *."

The *Brooklyn Life* case contains the following language:

"When this policy was issued, the statutes of this State required foreign insurance companies, transacting business here, to procure a certificate of authority from the comptroller. This certificate could be issued only on the filing of a certain statement, and paying a certain sum to the Fire Department Association and Medical College of Mobile. Any person violating the statute would be declared guilty of a misdemeanor, and subject on conviction to fine and imprisonment. * * * To show the illegality of the policy, the appellant proposed proving its failure to observe the statute. That the contract of insurance was made here does not seem to have been a disputed fact. The company may have violated the statute, and the agents making the contract may have been liable to the penalty imposed, but neither the assured nor the beneficiaries were involved in, or affected by their guilt. While it is a settled principle, that a contract founded on an act prohibited by statute is void; yet it is subject to this qualification, that although the legislature may forbid the doing of a particular act, a party not privy to it, or involved in

the guilt of the transaction, may recover of the guilty actor unless the act itself is void. Whetstone v. Br. Bank Montgomery, 9 Ala. 875.

"The statute did not declare void the policy or contract of insurance made here, by a foreign company, without a certificate of authority. Its purpose was not to absolve the company from liability on its contracts made here. The object was to afford our own citizens ample security against loss, because of transactions had here with the companies. The company and its agents are alone guilty under the statute, if they violate it. Such violation they cannot invoke as a protection from liability on their contracts."

■ It follows then that the trial court correctly held that the appellant could not take advantage of its violation of Title 51, § 823, to defeat the bond sued upon.

We must next look to the evidence for a determination of whether or not it supports the finding of the trial court that Hankins & Sigars' failure to provide adequate trucks and supervision delayed the appellee in the performance of his contract by some sixteen days.

The appellant does not deny that the appellee was entitled (assuming that the bond in this case was valid) to an amount for delay caused by the failure of Hankins & Sigars to perform its contractual obligation. However, it contends that the trial court erred in computing the damages for delay in the manner in which it did.

In this connection the trial court made the following findings, that:

" * * * during the course of its employment, Hankins & Sigars never complied with its contractual obligation to ' * * * at all times maintain sufficient men, materials, supplies and equipment and supervision on said job and prosecute work with such care, diligence and promptness as will not cause delay in the progress of contractor's work * * *.' "

The court found that the plaintiff's asphalt plant, which was located some miles from the interstate project, had an average daily productive capacity of 1,500 tons. However, it could produce no more than Hankins & Sigars' trucks could haul away, and, if Hankins & Sigars did not maintain sufficient trucks to handle the orderly flow of production, then the plaintiff would of necessity have to retard its production to keep pace with the availability of trucks. As the length of the haul from the plant to the construction site increased, the number of rounds which a given truck could make per day would decrease, thus creating the necessity for additional trucks to keep up with plant production. The trial court found that the evidence was quite clear, that even during the initial stages of the job, when the haul was the shortest, Hankins & Sigars was deficient in trucks needed to adequately handle the productive capacity of the plant. The court stated:

"Indeed, the evidence was without serious dispute that, despite repeated complaints and demands by the plaintiff, Hankins & Sigars was short by three to five trucks per day of the number of trucks needed to keep up the steady flow of production. Furthermore, the trucks on hand were plagued with breakdowns, and remained idle for long periods of time due to lack of supervision by Hankins & Sigars. In addition Hankins & Sigars' truckers struck for two full days in early June because they were not paid their agreed compensation by Hankins & Sigars.

"Plaintiff was delayed by this lack of trucks and truck breakdowns. The only question of substance is the extent and effect of these delays. United contends that there is no way to isolate the delays for which Hankins & Sigars was not responsible, i. e., weather, equipment breakdowns, etc., from the delays caused by truck deficiencies.

" * * * the testimony makes it clear that had Hankins & Sigars supplied the

deficient trucks each day, the production of the plant would have been accelerated to keep up with the increased availability of trucks. Therefore, the deficient trucks would have made the same number of daily rounds as the trucks actually present. The deficient trucks, if present, would have been no more affected by weather, equipment breakdowns and other causes not chargeable to Hankins & Sigars than the trucks actually working.

" * * * the court has determined that Hankins & Sigars actually worked on the project sixty-two days. The total number of truck days for those sixty-two days is 615 (the total of the maximum number of trucks on the job for these 62 days). The total number of rounds made by all trucks during these 62 days is 3,139, or an average of 5.1 rounds per truck per day. The average load per round is 22.5 tons (total production by Hankins & Sigars of 70,843 tons divided by 3,139 rounds). Using a daily average truck deficiency of three * * * plaintiff lost 15.3 rounds per day due to deficient trucks. The loss of these rounds decreased its average daily production by 344 tons per day. Had this truck deficiency been supplied, its average daily plant production would have increased from 1,130 tons (70,483 total Hankins & Sigars production divided by 62 work days) to 1,474 tons. This increase in daily production would, in turn, have decreased the number of days needed to attain Hankins & Sigars production from 62 to 48 work days—or 14 days.

"The court is convinced and so finds that the plaintiff was delayed by truck deficiencies for 14 days plus the two additional days involving the trucker strike—or 16 days.

"Paragraph II(a) of the subcontract provides: 'Should SUBCONTRACTOR breach this contract or otherwise delay its said work, CONTRACTOR will be caused to incur substantial damages, which may include not only a claim for liquidated damages by the OWNER, but also added expense to CONTRACTOR resulting from increased overhead, idle men and equipment and other expense incurred in connection with said work. SUBCONTRACTOR shall reimburse CONTRACTOR for any and all damages caused by SUBCONTRACTOR, and the same may be deducted by CONTRACTOR from the agreed price of said work.'

"The 16 day delay caused plaintiff to maintain its labor force and equipment on this job for an additional 16 days, causing it increased overhead, idle men and equipment and other expense, as contemplated by said subcontract.

"The court finds that the damages for this delay, for which plaintiff is entitled to be compensated under said subcontract, are as follows:

"(1) Labor cost for hourly labor per day $ 498.08

"(2) Supervision costs per day prorated over five day week 155.60

"(3) Idle time on equipment 690.00
"Damages for each day of delay $1,343.68

"Thus, plaintiff's damages for the sixteen days' delay equals $21,498.88."

The appellant does not deny that the evidence supports the finding by the trial court that the appellee suffered damage of $1,343.68 per day for each day of delay. Rather, its contention is that there was no evidence upon which the trial court could have based its conclusion that Hankins & Sigars' delay amounted to 16 work days. As indicated in the court's finding, this 16 days was arrived at by the court's calculating the length of time it would have taken to haul the asphalt involved if Hankins & Sigars had had a sufficient number of trucks available to haul the amount which the appellee's plant could produce each day. The evidence supported the court's finding that for each day they

worked Hankins & Sigars was short by at least three trucks for each workday. It then calculated that had Hankins & Sigars supplied a sufficient number of trucks to keep up with the plant production they could have hauled an additional 344 tons per day. The court then determined that had these 344 tons been hauled each day, Hankins & Sigars' hauling time would have been reduced from 62 days (75 work days less 13 days when no work was done because of weather, etc.) to 48 days, or a 14-day difference. The court then added the two days involved in the truckers' strike and arrived at a total of 16 days' delay.

We find no basis for reversal of this case because of the means adopted by the court to assess damages. Damages for breach of contract need not be assessed with mathematical precision. As noted in 22 Am.Jur.2d 44, Damages, § 25:

"* * * it is now generally held that the uncertainty which prevents a recovery is uncertainty as to the fact of the damage and not as to its amount and that where it is reasonably certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery or prevent a jury decision awarding damages. This view has been sustained where, from the nature of the case, the extent of the injury and the amount of damage are not capable of exact and accurate proof. Under such circumstances, all that can be required is that the evidence—with such certainty as the nature of the particular case may permit—lay a foundation which will enable the trier of the facts to make a fair and reasonable estimate of the amount of damage. The plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss."

This general statement is consistent with the law in this state. We think the trial court in this case had before it evidence which furnished a reasonable basis for the computation of the damages suffered by the appellee. We find nothing unreasonable with regard to the manner of computing damages adopted by the court. There being evidence to support this conclusion, it follows that the trier's conclusion must stand. There was nothing conjectural in the court's finding that 16 days' delay had been caused by the failure of Hankins & Sigars to live up to its contractual obligations. In fact, there was evidence to support a finding that as much as 19 days' delay had been experienced.

The last contention of appellant is that deviations from the contract released it from liability under its bond. The appellant contends that reduction in units to be hauled, the reduction occurring because the State redesigned the roadway, was one of the contractual changes which released it from its obligations under the bond.

By the express terms of the contract between appellant and Hankins & Sigars it was provided:

"SUBCONTRACTOR * * * shall omit any work which OWNER or SUBCONTRACTOR may require, without nullifying this subcontract, at a reasonable * * * reduction from the subcontract price, heretofore named, and pro rata to the same."

It is obvious then that the very contract which the appellant bonded provided for the kind of change which it contends discharged it from its obligation on the bond. We cannot agree with the appellant that this change, which became necessary because the State changed the specifications on the road under construction, lessening the amount required for its completion, worked such a change that it is discharged on this bond.

The appellant next contends that the payment by the appellee to Hankins & Sigars every two weeks instead of once a month and the reduction in the amount retained from seven and one-half percent to three

and one-half percent released it from the bond.

It is the settled rule in this state that before a surety may take advantage of any change in the obligation that this change in the contract must be material and must in order to discharge the surety prejudice the surety. In Maryland Casualty Co. v. First National Bank of Eufaula, 276 Ala. 575, 165 So.2d 359, the rule was expressed as follows:

"It is the well recognized rule that "An alteration or change in the contract or obligation must be material in order for a compensated or corporate surety to be discharged from liability thereby * * *.' 72 C.J.S. Principal and Surety §§ 124, 125. Maryland Casualty Co. v. Moore, 1 Cir., 82 F.2d 189, cert. den'd 298 U.S. 666, 56 S.Ct. 749, 80 L.Ed. 1390. We believe the record (and the appellant apparently concedes) clearly indicates that the changes and modifications made in the plans and specifications were not material changes, but minor ones amounting only to some $2,000.00 in a job costing more than $100,000.00. We fail to see any way in which the surety could have been prejudiced by these minor changes. Immaterial changes in plan or specifications to which the surety fails to consent will not discharge a surety on a performance contract, much less the surety on a bid bond. See 72 C.J.S. Principal and Surety § 126."

We do not believe that the evidence adduced below indicates that the surety in this case has been prejudiced by the reduction in the retainage in this case. Rather we think the evidence supports the conclusion that retainage was reduced in order to help Hankins & Sigars perform its contract.

The rule which exists in Alabama with respect to changes and consequent discharge of sureties is consistent with the following expression taken from 17 Am. Jur.2d, Contractors' Bonds, § 31 et seq.:

"However, and in accordance with the discussion in the following sections, where a construction contract makes express provisions with regard to the times or amounts of payments made to the contractor, the retention of percentages, or the exaction of certain certificates, estimates, or receipted bills, a *material* departure by the owner, without the surety's consent, from the requirements of the contract, operates to discharge the surety from liability to the owner on the contractor's bond, to the extent that such unauthorized payments result in *injury* or *prejudice* to the surety. * * *

"The above rule calling for the discharge of the surety by reason of improper payments to the contractor is subject to certain qualifications. In order to have the effect of discharging the surety on the contractor's bond from liability to the owner, departures from the terms of the contract with respect to payments made by the owner to the contractor must be material or substantial. Hence, making payments at intervals slightly different from those specified in the contract will not release the surety from liability to the obligee where the payments are in the proper amounts and proportions.

"It is likewise the rule that where payments made by an owner do not injure or prejudice the surety on the contractor's bond, the surety is not discharged even though the payments do not comply with the provisions of the building contract. Thus, where payments by the owner to the contractor satisfy claims or liens for labor or materials for which the surety would have been liable, a surety is not discharged by such payments although they are made without following the provisions of the contract with respect to the time, amount, manner, or conditions of payment. Under this rule, advancements by the owner to the contractor do not discharge the surety where the money is used by the contractor in the construction of the build-

ing, or where they afterward become due to the contractor and are deducted from sums then becoming payable. Similarly, advancements to pay laborers and materialmen, for which payment the surety would have been liable to the owner, do not release the surety." (Emphasis supplied.)

Under these principles we agree with the trial court that the changes in the contract worked out between appellee and Hankins & Sigars do not operate to release the appellant from its obligations under the bond. We do not agree that the evidence indicates that these changes were material, and further we find no evidence that the surety was prejudiced by the changes.

We have carefully reviewed other assignments of error made by the appellant and find no basis for a reversal. The judgment appealed from is affirmed.

Affirmed.

LIVINGSTON, C. J., and COLEMAN, BLOODWORTH, and McCALL, JJ., concur.

On Rehearing

SIMPSON, Justice.

The appellant on application for rehearing suggests vociferously that the opinion in this case is wrong on all counts. Appellant again seeks to avoid liability under its bond upon three grounds: (1) that it violates the statute of frauds; (2) that it is void because executed in violation of Title 51, § 823 of the revenue acts of Alabama; and (3) because the prepayment of retainage operates an absolute release of the surety from all obligations under the bond. We again address ourselves to these points:

▮ (1) In its argument that the agreement sued on violates the statute of frauds, the appellant points to the fact that no additional power of attorney was furnished

authorizing Pollock to execute the rider attached to the original bond. The statute of frauds is not the issue here. That statute requires only that a memorandum in writing signed by the "party to be charged therewith, or some other person by him thereunto lawfully authorized in writing" be shown. In this case there is a memorandum in writing signed by the corporation authorizing Pollock to execute bonds on behalf of the corporation up to $250,000. The question is whether that power authorizes him to make corrections in bonds which he is admittedly authorized to execute for the corporation. The trial court found and the evidence supports the conclusion that the company issued to Pollock blank powers of attorney, limited only as to amount. The obligee was not shown on these forms, nor was the amount of the obligation. The company is in the awkward position of admitting Pollock's authority to make bonds binding it up to $250,000, but insisting that he has no authority to make clerical corrections in bonds he has authority to make.

In this case the only contract Hankins & Sigars had was with W. S. Newell, Inc. This is the bond the company was called upon to write. Hankins & Sigars never had any contract with Newell Roadbuilders, Inc. Pollock was furnished a copy of the Hankins & Sigars contract. The name Newell Roadbuilders, Inc. appeared in that contract as "owner" because W. S. Newell, Inc. was a subcontractor of Newell Roadbuilders, Inc. This name was inserted as obligee in the bond. Surely it must have been the intention of the company to issue a bond in favor of the corporation with which Hankins & Sigars had a contract. We cannot assume that the wrong name was inserted other than by mistake, for to make such an assumption would mean that the company did it by design to avoid any obligation under the bond. Having accepted the premium, we cannot assume it never had any intention to enter into a valid and binding obligation.

When the bond was delivered to W. S. Newell, Inc. the mistake was noted and

Pollock was asked to correct the bond. He did so by rider. The company now contends that Pollock had no authority to correct that mistake. It would presumably contend he had no authority to correct mistakes which might have been made in the amount of the bond. Here the contract and bond amount was $82,660. Suppose through typographical error the bond had been written for $182,660. Would the company contend that a rider correcting this figure to meet the contract figure was void because Pollock lacked authority to correct it? We think not.

 As noted at 3 Am.Jur., Agency, § 28, in construing powers of attorney, " * * * the first and foremost rule is that the intention of the parties as it existed at the time the power was granted is to be given effect". We think the trial court correctly held that Pollock's written authority extended to making corrections in bonds so as to effect the purpose of same. Surely he could do by corrective rider what he was authorized to do initially.

(2) It is next argued again by appellant that its bond is invalid because it was not countersigned by a licensed resident agent as provided by Title 51, § 823, Code. The appellant in brief in emphasized language stressed the fact that it does have licensed agents in Alabama qualified to countersign bonds issued in this state. It denies any obligation under the bond it issued in this case because it did not have the same countersigned by such agent. This statute was not designed to permit out of state companies to escape liability on bonds which they write in derogation of the statute. It is a revenue statute to facilitate the collection of privilege taxes and fees for agents. It provides for penalties for failure to comply with its terms, but it does not say that failure to comply relieves corporations from liability on obligations undertaken in defiance of the statute.

(3) Lastly, it is again insisted by appellant that this court is wrong in having held, as does a majority of courts in this country, that premature payment of retainage did not operate a complete absolute release of the surety from all obligations under its bond. We have again reviewed the authorities on this contention. Most cases hold that in order to work a discharge of the surety, the alteration of the contract must be material. To be material the alteration must change the nature of the contract, either by imposing some new obligation or taking away some obligation originally imposed. The effect of the change must be to place the surety in a different position than the one occupied before the change was made. A change in the form of contract which does not effect one or the other of these results is immaterial and will not discharge the surety. See Sterne, The Law of Suretyship, Chapter 6, § 6.3. The trial court found, and we agree, that the premature payment of the retainage here did not amount to a material change in the contract, and hence did not work a discharge of all obligations under the bond.

Opinion extended, and application for rehearing overruled.

LIVINGSTON, C. J., and COLEMAN, BLOODWORTH, and McCALL, JJ., concur.