Appeal by Southeast Alabama Broadcasting Company, Inc., d/b/a WDHN-TV, from an adverse judgment in a breach of contract action. We affirm in part, reverse in part, and remand.
The action was commenced by Maury J. Farrell when he filed a complaint against Southeast alleging that Southeast had breached its contract under which Farrell was employed as general manager of Southeast's television station in Dothan. Following trial a jury verdict awarded Farrell $100,000 as damages, and judgment was entered thereon. Southeast's motion for a new trial was overruled, and this appeal ensued.
Two questions are presented for our review:
(1) Whether the verdict was against the great weight and preponderance of the evidence.
(2) Whether the jury improperly assessed plaintiff's damages.
On the first issue we note that the defendant has made this challenge to the evidence by a motion for a new trial, which was measured by the subjective "palpably wrong, manifestly unjust" standard. See Casey v. Jones, 410 So.2d 5 (Ala. 1981) (comparing use of directed verdict and J.N.O.V. with motion for new trial). The action of the trial court in denying a motion for a new trial carries with it a strong presumption of correctness, and that action will not be reversed unless the evidence "plainly and palpably" fails to support the verdict.Chavers v. National Security Fire Casualty Co., 405 So.2d 1
(Ala. 1981). Our review of the record compels the conclusion that the trial court's action denying the defendant's motion for a new trial was correct. Indeed, the evidence was conflicting on Farrell's performance of his contract as general manager. The central issue on this point is whether Farrell willfully failed to perform his duties.
Under the contract terms, Southeast employed Farrell for a term of three years at a salary of $39,600 per year, plus other inducements which we will allude to later. Southeast retained the right to terminate *Page 758 
Farrell's employment on thirty days' written notice, but with this proviso:
 "unless the Employee's employment hereunder is terminated because of willful failure or refusal to perform the duties required hereunder Company shall be obligated to fulfill all of the obligations prescribed herein until the end of the term of this Agreement."
Farrell was terminated without notice. Southeast contends that the evidence conclusively established justification for Farrell's discharge. Southeast reaches this conclusion through two instances. In one, Farrell had established a bank account out of which the station's accounts payable and bank notes were to be paid. Farrell testified that this account was to exist without the knowledge of the owners of the station. Only Farrell, the station bookkeeper, and one other station employee were to know of this bank account. Farrell justified his action as in the station's best interest, to establish a reserve to pay long-term indebtednesses on time. His contract, he testified, was to operate the station in every category, including financial, to the best interest of the station. He added that he had been informed by the owners that they would no longer pay the bank obligations and had directed him to make arrangements for payment.
In the other instance, it was shown that Farrell had sent a memorandum to the station's bookkeeper as follows:
 "In your absence we have opened a RESERVE bank account at First Alabama. NO ONE is to know of this. It is there to help us build up some reserve for the time when we have to begin paying the Bank notes. As of today, 9/25/80 the notes have not been paid for September. Tom Jones informed us today it would be wired tomorrow, which means he `ain't got it yet and will scrounge for it all day today and tomorrow.' We will probably not have it by the time you return."
Farrell sent a second memorandum to the bookkeeper:
 "Tom Jones will be here on Tuesday. He is bringing a CPA from Gainesville, Fla., who he says he has hired for all the Hi Ho Stations. He says this joker, a Senior Partner will not leave here until he has closed the 79 books and done all the things Ira didn't do. He may ask you to work overtime, DON'T. Tell him you are under doctor's orders to limit yourself until the baby is born — or any other flimsy excuse you are capable of coming up with. Drury Flowers says he will tell Tom Tuesday that he and the bank would have preferred a local CPA and possibly, but not probably the `fat man' will relent, but don't count on it. I'm determined to eliminate all A/P's A S A P. With one or two more months like September we can be plum outta debt. Incidentally, remember if Tom asks for bank balances, always deduct 50%. How will we hide that from the auditor?"
Farrell's testimony is relevant on his reasons for these memoranda:
 "Q. Wasn't it a part of your agreement to begin with, that the station would pay up to fifteen thousand dollars a month on the bank service debt?
 "A. That was until we found almost one hundred thousand dollars worth of back bills that we paid out of our income.
 "Q. Okay. And, the corporation, they were paying these back payments, the station wasn't paying those, were they?
 "A. They were telling us that they paid fifty-one thousand dollars to us, but we never seen [sic] it. To quote Mr. Antoniak, you didn't see it, because it was paid to you in equipment. Equipment didn't pay bills, Mr. Herring.
 "Q. Okay. But, didn't you need the equipment though, too?
 "A. Yes. We needed to pay bills more than we needed equipment.
 "Q. Well, why did you tell Mrs. Marshall to tell these folks to tell your bosses now, your immediate superiors, that if they asked how much money was in the bank, to tell them we have got half that much? Why did you tell her to do that?
 "A. Very simply, every time they would call up and we would say that we have got a bill in here from the Sheraton *Page 759 
Hotel, have you got the money in the bank? If we said yes, well, you pay it and we will get it back to you. When we got ready to put up a billboard promotion, getting ready for ratings, we had to pay for the paper before they would post the boards. And, Mr. Antoniak said I will pay for that. When the time came, we had to pay for it. So any time they knew we had a reserve —
"Q. Uh-huh. (Affirmative response.)
 "A. — we were being called on to pay back bills or pay debts to McDaniel and Company that they agreed to pay in Orlando. They paid the first payment and then all of a sudden, well, if you have two grand in the bank, pay it and we will get it back to you. So, I told her to hold back fifty percent or we would never get the bills paid."
We have concluded that these and other instances of Farrell's management made the issue of his willful failure or refusal to fulfill his duties one for the jury. The jury had before it evidence of the problems existing at the station when Farrell assumed its management, the broad authority given to him by the station's owners, and Farrell's conduct pursuant to that authority. Under that evidence the jury was in a position to determine whether any of Farrell's conduct as general manager constituted a willful failure subjecting him to discharge. The jury resolved that issue in his favor. Under that evidence the trial court's action in denying the defendant's motion for a new trial cannot be viewed as palpably wrong.
Defendant raises several issues pertaining to the jury's award of damages, one of these being that the jury failed to reduce Farrell's damages by the amount of his salary from his new employment.
On this issue the record discloses that by agreement of the parties the trial court charged the jury that "the Plaintiff is under a duty to mitigate his damages and you may consider any salary and benefits that he has earned since date of any breach of the subject contract." Farrell proved in damages some $111,000 which included his base salary, his incentives, one year's rental value of an automobile that was to be supplied, the annual cost of hospitalization insurance for the years 1981 and 1982, and unpaid expenses. Farrell testified that in the middle of January 1981, approximately one month after his dismissal by Southeast, he was employed with a radio station in Sylacauga as sales manager, which was his position at the time of trial, at an annual salary of $16,323; that he was supplied a vehicle, and that his employer paid one-half of his hospitalization insurance. No dollar amount was assessed for these latter two items. Farrell was discharged on December 18, 1980; thus on the date of the judgment in his favor he had earned something more than $16,323 and, by agreement of the parties, the jury should have considered this sum in mitigation of Farrell's proven damages. Thus, there is an approximate sum of $5,323 as a discrepancy between the actual jury verdict and the amount the jury could have awarded if it had reduced the proven damages pursuant to the mitigation charge.
Plaintiff maintains, on the other hand, that the language of the agreed-to instruction, i.e., the use of the word "may" instead of "will" or "shall," authorized the jury to ignore Farrell's new earnings. We cannot agree with that position. The agreed-to instruction recognized Farrell's legal duty to mitigate his damages. Alabama Credit Corporation v. Higgins,251 Ala. 17, 36 So.2d 227 (1948). The charge was given in recognition of that duty by both parties and in context it is, therefore, more reasonable to view the parties' use of the word "may" as "shall" in order to allow the jury to ascertain whether the plaintiff fulfilled his duty to mitigate. Plaintiff, moreover, contends that the $5,323 discrepancy is "explained [satisfied]" by the fact that plaintiff is entitled to prejudgment interest under Code of 1975, § 8-8-8. However, the record discloses that plaintiff neither asked for an instruction on entitlement to prejudgment interest nor objected to the trial court's oral charge on damages, which made no mention of interest. In fact, plaintiff does not complain here of the *Page 760 
trial court's charge as being incomplete; plaintiff maintains only that because he was entitled to interest, the deficiency should be considered as offset by that entitlement. To the contrary, although plaintiff was not required to allege interest, Alabama Terminix Company v. Howell, 276 Ala. 59,158 So.2d 915 (1963), he should have requested an instruction on recovery of interest had he sought it, and he cannot now insist that he be allowed accrued interest on his breach of contract judgment when he himself requested none.
Finally, Southeast argues that the jury was improperly allowed to consider projections of the station's gross revenues for 1982 in assessing Farrell's damages. Under his employment contract, Farrell was to be paid a revenue incentive equal to one percent (1%) of the total gross revenues derived from station operations during each calendar year of his three-year employment period.
At bottom, the issue is whether Farrell adduced evidence of gross revenues which were reasonably within the contemplation of the parties or foreseeable at the time the parties contracted. Scott Southern Division Employees Credit Union v.Loftin, 50 Ala. App. 571, 281 So.2d 283 (1973). Under this requirement Farrell was required only to prove gross sales revenue with reasonable certainty, in order to present a reasonable estimate of the amount of revenue on which to base his loss. Paris v. Buckner Feed Mill, Inc., 279 Ala. 148,182 So.2d 880 (1966); United Bonding Ins. Co. v. W.S. Newell, Inc.,285 Ala. 371, 232 So.2d 616 (1970). Farrell's evidence of the station's gross revenue for 1982 came from the testimony of the station's bookkeeper, who was also Southeast's comptroller. She gave as the station's reasonable projection of gross revenue for 1982, based upon that of 1981 and gross revenues for the first two months of 1982, as "over a million dollars," and she stated that $10,000 would be a fair figure for 1982 if Farrell was due one percent of the total gross revenues. Under that evidence, it cannot be concluded that this aspect of Farrell's damages was based upon either conjecture or speculation.
The parties have used the term "approximately" in referring to Farrell's salary in mitigation; hence, the $5,323 which Farrell should not have received, is also "approximate." Because the parties agreed to the basis for mitigation, and the ascertainment of the exact sum thereunder not appearing difficult, we remand the cause to the trial court with directions to determine the exact amount of the discrepancy. Having made that determination, the trial court is directed to require a remittitur from the plaintiff in the amount of that discrepancy, and the failure of the plaintiff to remit is to result in a new trial on the issue of damages. Upon the acceptance of that remittitur, the trial court is to enter a judgment for the plaintiff for the amount of damages due after deducting the remittitur. It is so ordered.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.